## 40397. ROBERTS v. THE STATE.

MARSHALL, Presiding Justice.

Victor Roberts was indicted in Fayette County for the murder of Mary Jo Jenkins. His case was tried under the Unified Appeal Procedure.[1] A jury found Roberts guilty of murder and sentenced him to death. We affirm.

1. Shortly after 11:00 a.m. on February 1, 1983, a school bus from kindergarten dropped the victim's son off at their home on Lee's Lake Road. A few minutes later, the boy walked the quarter of a mile to a neighbor's house to ask for help. He told the neighbor that his mother's nose was bleeding. The neighbor returned with the boy and discovered Mrs. Jenkins lying on a walkway behind her house. Mrs. Jenkins was dead, having been shot in the chest. The neighbor called the police.

Investigators arrived and searched the premises. They found a bullet hole in the screen of the back porch. Using a metal detector, they found a .38 caliber Winchester bullet at the edge of a fenced area of the backyard. Inside the house, next to the television, they found a blue attache case containing papers which led to the identification of its owner as Hapeville attorney Preston Holland.

GBI Agent Dan Greene contacted the Hapeville Police Department and learned that, on the preceding day, Holland had reported his 1969 Oldsmobile station wagon as being stolen. Upon contacting Holland, Greene learned that the blue case had been in the car at the time.

A lookout was placed on Mr. Holland's car. It was recovered in southwest Atlanta the next day. On the afternoon of February 2, after the car had been located, agent Greene talked to an informant who had been brought to GBI headquarters in Hapeville by Atlanta police officers. Greene was told that the informant was reliable, and that he had been responsible for more than one hundred arrests in a three-year period.

This informant told Greene that, on the evening of January 31, he had ridden with a friend named Vic, whose last name the informant did not know, in an Oldsmobile station wagon that Vic had stolen. The informant told agent Greene that he saw Vic again the next day.

---

[1] The death sentence was imposed by the jury on March 30, 1983, and a motion for new trial was filed. The transcript of evidence was filed on May 2, 1983. The motion for new trial was heard on August 12, 1983, and was overruled on August 12, 1983. Notice of appeal was filed in the trial court on August 22, 1983. Briefs were filed and the case was argued in this court on November 22, 1983.

Vic had a .38 caliber pistol that the informant offered to buy. Vic refused to sell. He told the informant that the gun was "dirty," and that he had probably harmed a woman "down South."

Agent Greene asked the informant if he could get the pistol. The informant told Greene that Vic had sold it, but that he knew who had bought it. The pistol was soon recovered. A ballistics examination performed that evening identified the pistol as the murder weapon.

At approximately 8:00 p.m. on February 2, Fayette County sheriff's investigator Tommy Nations, who was with agent Greene in Hapeville, relayed the foregoing information along with a description of the suspect to investigator Whitlock in Fayette County and instructed him to obtain an arrest warrant. Whitlock told the issuing magistrate some, but not all, of the foregoing information, and an arrest warrant was issued for Vic LNU (last name unknown).

Agent Greene then contacted Bruce Pickett, a GBI Agent with the Metro Fugitive Squad, and asked him to locate "Vic." The defendant was located, and arrested just after midnight on the morning of February 5 by Pickett, Whitlock, and two other officers, in the apartment of Priscilla Collier (with her prearranged assistance).

In his tenth enumeration of error, the defendant contends that he was illegally arrested. The defendant contends that the issuing magistrate was given insufficient information to meaningfully determine probable cause and that the arrest warrant was therefore invalid. We disagree.

"Apparently [the defendant] is seeking to have the probable cause requirements of an affidavit on which a search warrant is issued [cit.], made applicable to arrest warrants. Georgia imposes no such requirements on its arrest warrants." *Smith v. Stynchcombe,* 234 Ga. 780, 781 (218 SE2d 63) (1975). See OCGA § 17-4-40 et seq. (Code Ann § 27-102 et seq.)

Alternatively, the defendant contends that if OCGA § 17-4-41 (Code Ann. § 27-103) does not require the showing of probable cause by affidavit prior to the issuance of an arrest warrant, it is unconstitutional. Pretermitting any deficiency in the manner in which the defendant has attempted to make a constitutional attack upon OCGA § 17-4-41 (Code Ann. § 27-103), we need not decide the issue, for the arrest was plainly supported by probable cause and thus, even if the arrest warrant was invalid, the arrest was nonetheless legal. See Illinois v. Gates, —— U. S. —— (103 SC 2317, 76 LE2d 527) (1983); United States v. Watson, 423 U. S. 411 (96 SC 820, 46 LE2d 598) (1976); *Mincey v. State,* 251 Ga. 255 (6) (304 SE2d

882) (1983).

2. After Ms. Collier admitted the arresting officers into her apartment and told them that the defendant was in the bedroom, the officers entered the bedroom with their guns drawn. The defendant threw up his hands and said, "[D]on't hurt me, I didn't mean to kill that woman." As he was being handcuffed, he claimed that the killing was an accident. As he was being taken to the police car, the defendant reiterated his earlier statements and then volunteered to take the officers to the person to whom the defendant had sold the gun.

Later that morning, the defendant was interrogated at the Fayette County sheriff's office. Agent Greene gave the defendant warnings derived from Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). Afterwards, the defendant signed a written waiver form, which recited that he understood his rights (which were enumerated on the form), that he freely and voluntarily waived his right to an attorney, and that he was willing to make a statement. He thereafter gave a lengthy statement, which was recorded and later transcribed.

In the statement, the defendant claimed that he was accompanied by another person named Green. Green, the defendant said, asked him if he wanted to "do something." The defendant answered in the affirmative. They rode down the highway to some "stray houses." They pulled into the driveway of one, got out, and knocked on the door. Green had the blue attache case under his arm. When a woman answered the door, Green started hitting her on the head with a pistol, which had been inside the case, and pushed her into the house. She asked what they wanted and Green said, "[W]e [are] robbing you so shut up and sit down." Then Green gave the pistol to the defendant, who covered the woman while Green went to the bedroom. The woman got up and ran out the back door. She started hollering for the neighbors. The defendant ran outside, followed by Green, who told the defendant to shoot. The gun was already cocked. Green reached over and grabbed it and it "went off." The defendant stated that Green kept the gun, but later told the defendant to sell it.

In his seventh enumeration of error, the defendant contends that his statements were involuntary and that the court erred by allowing their admission in evidence.

The trial court found that the statements volunteered by the defendant at the scene of his arrest were not the product of custodial interrogation. The record supports this finding. Thus, the court did not err by ruling that these statements were admissible. *Findley v. State,* 251 Ga. 222 (1) (304 SE2d 898) (1983).

Regarding the transcribed statement, the trial court found that, after being advised of his rights under Miranda v. Arizona, supra, the defendant waived those rights, and that the statement was not the product of threats, force, or promises of leniency. The record supports these findings, and the trial court therefore did not err by ruling that this statement was admissible. *Mincey v. State,* supra, (6 c).

3. The informant whose assistance led to the defendant's arrest also testified for the state at trial. This witness told the jury that the defendant had a pistol on January 31, the day before the killing, that he refused to sell because, the defendant said, he "was going to do something with it." The next day, the witness asked again about the pistol. The defendant said that he had already sold it, but that the witness did not want it anyway. Later, the defendant told this witness that, posing as an insurance salesman, he broke into a house; that, when a woman answered the door, he rushed her with the pistol; that, when she tried to get away, he tried to tie her up; that he hit her "up side the head" with the pistol; that she got loose and ran out back, and he shot her as she was hiding behind a grill; and that he tried to pull her back in, but could not, so he left the blue case and ran.

Latent prints discovered on papers inside the blue case, and on other papers found inside Mr. Holland's stolen automobile were identified as being the defendant's.[2]

In his fourteenth enumeration of error, the defendant contends that the evidence was insufficient to support the conviction. We disagree. The evidence was sufficient to convince a rational trier of fact that the defendant murdered Mary Jo Jenkins. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

4. On February 7, 1983, attorney H. Geoffry Slade was appointed to represent the defendant. On March 3, attorney James Hamilton was appointed to provide additional representation for the defendant. On March 16, the trial court awarded $500 to the defendant to pay for the services of an investigator. The investigator retained by the defendant made his final report to the defense attorneys on March 22. Attorney Slade testified at the hearing on the motion for new trial, and confirmed that the defense had ample time to work with the investigator and that he gave them all of the facts prior to trial. The trial began March 28, 1983.

In his second enumeration of error, the defendant contends that the trial court erred by refusing to grant the defendant's motions for

---

[2] No prints were discovered which matched those of the informant or of Green, who was also apprehended and arrested.

continuance. Under the circumstances of this case, we find no error. *Rivers v. State,* 250 Ga. 303 (5) (298 SE2d 1) (1982).

5. In his fifth enumeration of error, the defendant contends that the trial court erred by denying the defendant's motion for change of venue. We find no error. Of the 43 jurors whose voir dire appears in the record, at least 15 had not read or heard anything about the case. The rest had read very little. Only one had an opinion regarding the case. See Division 10 (h), post.

The trial court ruled: "42 qualified jurors for selection of a jury in this case have been qualified out of a total of 43; . . . only one juror was disqualified, and that was on the basis of conscientious objection to capital punishment; . . . by my . . . notes, very few of the jurors had any information concerning this case, other than one or two casual readings of news stories in the local paper; . . . [and] none of the jurors interrogated [was] disqualified because of knowledge or information concerning the facts and circumstances of this case . . . [B]ased upon these facts . . ., the defendant's motion for change of venue is denied."

Nothing in the voir dire indicates any prejudicial community bias against the defendant, nor has the defendant otherwise demonstrated that the setting of the trial was inherently prejudicial. We conclude that this enumeration of error is meritless. *Rivers v. State,* supra, (3).

6. The defendant's eighth enumeration of error, challenging the practice of death-qualification of potential jurors during voir dire, is likewise meritless. *Mincey v. State,* supra, (2).

7. During voir dire, three prospective jurors expressed a conscientious objection to the death penalty. One was excused. In his ninth enumeration of error, the defendant contends that the trial court erred by excusing this juror. The sequestered voir dire of this juror transpired as follows:

"BY MR. CALDWELL [for the State]:

"A. Mr. Akeman, in this connection the state is seeking the death penalty against this man who is charged with murder. Are you aware of that?

"A. No, I'm not.

"Q. All right, sir. The state is, so that I might inform you. The law requires that I ask you certain questions. I asked you four of those questions while you were seated with the rest of the jurors. The fifth question that I need to ask you since you have now been informed that this is a death penalty case, are you conscientiously opposed to capital punishment?

"A. Yeah, I am.

"Q. Are you so irrevocably opposed that you would vote against the death penalty regardless of the facts and circumstances that

might emerge in the course of the proceeding?

"A. I don't know. I've never been put in this position before. I've always basically opposed the death penalty.

"Q. Yes, sir. But the question is, though, are you so —

"A. Okay.

"Q. — irrevocably opposed that you would vote against it regardless of what the facts of the case might turn up? Would you still be against the death penalty regardless of the circumstances or the facts of the case?

"A. I think so.

"MR. CALDWELL: Your Honor, I would challenge this juror because I think under the statutory requirements that it is proper that he be excused.

"MR. SLADE [for the defendant]: Your Honor, may I — before you rule, may I try to rehabilitate the witness?

"THE COURT: No, sir. If I understand, what you are telling me is that — or what you are telling us is you would not consider the death penalty regardless of what the facts and the circumstances in evidence were.

"THE JUROR: That's the way I've always felt about it.

"THE COURT: The question is, do you feel that way now?

"THE JUROR: Yes.

"THE COURT: I'll excuse the juror."

The defendant contends that the prospective juror's answers were tentative and equivocal and that his excusal therefore violated the precept of Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). The defendant also contends that the trial court erred by refusing to allow his attorney to examine the prospective juror. We address each contention in order.

"The most that can be demanded of a venireman [regarding capital punishment] is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out . . ." Witherspoon v. Illinois, supra, 391 U. S. at 522, n. 21. (Emphasis in original.)

We agree with the defendant that this juror's initial answers were not sufficiently unambiguous and unequivocal to justify his excusal. *Blankenship v. State,* 247 Ga. 590 (4) (277 SE2d 505) (1981). As the juror explained, he was unaware, until questioned, that the state was seeking the death penalty in this case and, moreover, had never been put in the position of having to decide whether he could

vote to impose the death penalty. Thus, although he had always been opposed to the death penalty, he could not immediately give a positive answer to the question whether he would vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings. It is clear to us, however, as it must have been to the trial court, that, as the juror considered the issue, he came to the firm conclusion that he could not impose the death penalty in any case, regardless of the evidence.

Ideally, perhaps, the trial court should have inquired whether the juror could *vote* for the death penalty rather than whether the juror could *consider* it. However, we conclude that, while a juror might be willing to consider the death penalty without being willing to vote to impose it (*Cofield v. State,* 247 Ga. 98 (2) (274 SE2d 530) (1981)), the converse is not true, i.e., a juror who is unwilling even to consider the imposition of the death penalty is clearly unwilling to vote to impose it.

We cannot agree with the defendant that the juror's answers to the relevant questions were too tentative and ambiguous to justify his excusal. Nor can we agree that the trial court committed reversible error by refusing to allow the defendant an attempt to "rehabilitate" the juror.

General individual voir dire is conducted "after the usual voir dire questions have been put by the court." OCGA § 15-12-133 (Code Ann. § 59-705). The reference in this Code section to the "usual voir dire questions" is to OCGA § 15-12-164 (Code Ann. § 59-806).[3] *Jordan v. State,* 247 Ga. 328 (6) (276 SE2d 224) (1981). Question (4) of OCGA § 15-12-164 (Code Ann. § 59-806) concerns conscientious objection to the death penalty. If the juror's answers to the Witherspoon questions clearly disqualify him, the defendant is not entitled to further questioning as a matter of right, although the trial court may allow it. In this case, since the juror's answers clearly disqualified him, the trial court did not abuse its discretion by refusing to allow defense inquiry of the juror.

None of the foregoing is intended to imply disapproval of defense participation in the Witherspoon questioning of jurors. It is often allowed. See, e.g., *Mincey v. State,* supra; *Castell v. State,* 250 Ga. 776 (301 SE2d 234) (1983); *Cofield v. State,* supra. Moreover, the refusal to allow it might in some cases amount to an abuse of discretion. See, e.g., Burns v. Estelle, 626 F2d 396 (5th Cir. 1980).

However, in this case, the juror was properly excused. Therefore,

---

[3] The responsibility for asking these questions may be delegated by the court to the district attorney. *Hicks v. State,* 232 Ga. 393, 400 (207 SE2d 30) (1974).

the defendant's ninth enumeration is meritless.

8. In his first enumeration of error, the defendant contends that the trial court erred by allowing two autopsy photographs of the victim to be admitted in evidence. Each of the two photographs depicted the victim's nude body after a y-shaped incision had been cut into the skin of her chest and stomach, exposing her internal organs. One of the photographs was taken after her scalp had been cut and pulled back over her skull, exposing the underside of the scalp.

The state contends that each photograph was admissible. The photograph of the underside of the scalp, the state contends, showed an area of traumatic hemorrhage under the scalp in the left temple area which was much more significant than apparent from an external examination of the scalp. The other photograph, the state says, shows through the use of a probe the angle at which the bullet entered the victim's body. The state contends that this could not have been reliably established by the pathologist absent an internal examination of the body to determine if the bullet had traveled an undeflected path through the body.

"We need not and do not rule on the impact of *Brown v. State,* 250 Ga. 862 (5) (302 SE2d 347) (1983), on this issue in view of the fact that this case was tried before *Brown* was decided. *Brown* has been held to have prospective operation only. *Grant v. State,* 251 Ga. 434 (306 SE2d 265) (1983)." *Ward v. State,* 252 Ga. 85, 89 (311 SE2d 449) (1984). Thus, we conclude that the admission of these photographs was not reversible error. *Ramey v. State,* 250 Ga. 455, 456 (1) (298 SE2d 503) (1983).

9. In his twelfth enumeration of error, the defendant contends that the trial court's charge on implied malice was error.

At the conclusion of the guilt-phase charge, the jury was sent to the jury room, and the court asked "Does the defendant have any objections or exceptions to the charge?" Defense attorney Hamilton answered, "We have none, Your Honor."

"If . . . the trial court asks if there are objections to the charge, defense counsel must either state his objections or reserve the right to object on motion for new trial or on appeal. [Cit.] . . . Where objections are requested, the failure to . . . object or to reserve the right to later object amounts to a procedural default barring appellate review of the charge. [Cit.]" *Rivers v. State,* supra, 250 Ga. at 309.

Thus, we do not further consider the defendant's twelfth enumeration.[4]

---

[4] We note, however, that identical charges have been approved by this court in other cases. See, e.g., *Castell v. State,* 250 Ga. 776 (10a) (301 SE2d 234) (1983); *Hosch*

10. In his fourteenth enumeration of error, the defendant contends that the trial court erred by denying his motion for new trial. In support of this enumeration of error, the defendant argues in his brief that the evidence was insufficient to support the jury's verdicts at either the guilt-innocence phase or the sentencing phase of the trial, issues which we address elsewhere in this opinion. Since the remaining grounds urged in his motion for new trial are not argued in this enumeration of error, they ordinarily would not be addressed. See *Dean v. State,* 163 Ga. App. 29 (1) (293 SE2d 492) (1982); *City of Douglas v. Rigdon,* 116 Ga. App. 306 (157 SE2d 66) (1967). However, since this is a death-penalty case tried under the Georgia Unified Appeal Procedure, we "review each assertion of error timely raised by the defendant during the proceedings in the trial court . . . regardless of whether error is enumerated in the Supreme Court." Unified Appeal Procedure, Rule IV (b)(2) (Code Ann. Ch. 27-25 Appendix).

The grounds raised in the original motion for new trial, and grounds 1, 3, 4, 8, 9, 10, 17, 19, 21, 23, 24, 25, 26 and 27 of the amended motion for new trial are dealt with elsewhere in this opinion. We address the remaining grounds in order:

(a) In ground 2, the defendant contends that the trial court erred by granting him only $500 to hire an investigator. We find no error. Two attorneys were appointed by the court to represent the defendant. When they asked for investigative assistance, the court approved the expenditure of $500 for investigative services and told the attorneys: "If you need any additional funds, then we'll just have to get back together . . . I'll approve $500, and we'll take a look at it if and when you've spent that." The defendant made no subsequent requests for additional funds, and, as one of his trial attorneys conceded later, the investigator gave them all of the facts prior to trial. See Division 4, ante. Compare, *Mincey v. State,* supra, (4); *Wilson v. State,* 250 Ga. 630 (2 c) (300 SE2d 640) (1983).

(b) In his fifth and eleventh grounds, the defendant contends that the trial court erred by denying his motion challenging the grand and traverse juries. We disagree. The burden was on the defendant to establish the invalidity of the juries. *Estes v. State,* 232 Ga. 703 (3) (208 SE2d 806) (1974). Citing lack of time, the defendant produced no evidence to support his challenges, and the trial court properly dismissed the defendant's "Motion Challenging Grand and Petit Juries" for want of prosecution.

---

*v. State,* 246 Ga. 417 (5) (271 SE2d 817) (1980); *Franklin v. State,* 245 Ga. 141 (9) (263 SE2d 666) (1980).

(c) In his sixth ground, the defendant contends that the trial court erred by not granting his "Motion to Produce the Confidential Informant."

The informant's name was on a witness list furnished to the defendant three weeks prior to trial. Upon being informed by defense attorneys shortly before the commencement of voir dire that they could not locate the informant, the trial court directed the state to allow the defense an opportunity to talk with the informant, who had been subpoenaed as a witness, as soon as he arrived, and before the trial began. The defense did, in fact, talk to the witness prior to trial. Thus, the defendant's request for relief was answered by affirmative action on the part of the trial court on behalf of the defendant, as to which no dissatisfaction was expressed until after trial (and after the defendant's trial attorneys had been dismissed and another attorney retained to prosecute the defendant's post-conviction remedies). This ground is meritless.

(d) In his seventh ground, the defendant contends that the court erred by denying the defendant's "Motion to Test, Inspect and Examine Physical Evidence."

The defendant wanted to inspect and photograph the blue attache case, the murder weapon, and an artificial rose found at the Jenkins' residence after the murder. These items of evidence were at the crime lab. The district attorney sent investigator Nations to the crime lab on Thursday or Friday prior to trial to retrieve these items for the defendant. Someone at the crime lab (the record does not show who) refused to turn these items over to Nations because of concern about the chain of custody. Upon Nations' return to Fayette County, the district attorney called Dr. Dawson, the deputy director of the crime lab, and made arrangements for the defendant's attorneys to inspect the items, at the crime lab, before 4:00 p.m. Friday. However, neither of the defendant's attorneys could make such a visit at the time provided.

All this was brought to the trial court's attention the morning of the trial, before voir dire began. The court ordered that a deputy be sent to the crime lab to retrieve the items immediately. Apparently, this was done, as no further requests were made concerning these items, and no complaints were registered until the amended motion for new trial was filed.

The defendant speculates that he "could have actually benefited by having seen [the murder weapon] before the actual morning of the trial." We conclude that this speculation is insufficient to demonstrate harm, even if it could be said that there was error. Compare *Sabel v. State,* 248 Ga. 10 (6) (282 SE2d 61) (1981).

(e) In his twelfth ground, the defendant contends that the court erred by arbitrarily limiting defense voir dire to only one general question regarding the jurors' racial bias.

The third juror who underwent voir dire was asked by the defense, "Is there any prejudice in your own mind concerning the fact that this defendant is black in this case?" The juror answered, "Certainly not." The defendant asked no further questions on the subject. After the juror stepped down, the district attorney stated that if any further such questions were asked, he was going to object. The court ruled, "I'll allow [the defendant] to ask that one question, but I will not allow [him] to pursue it unless there is a positive response to it." Attorney Slade responded for the defendant that "... I have not pursued it and I certainly don't want that to become important in the case . . ."

It is clear from the record that the defendant was allowed to ask the only question that he wanted to ask on the subject of racial prejudice. Thus, pretermitting any question of the right of a defendant to conduct further voir dire regarding racial bias, see *Tucker v. State,* 249 Ga. 323 (4) (290 SE2d 97) (1982), we find no error in this case.

(f) In his thirteenth ground, the defendant complains of the court's refusal to allow him to voir dire potential jurors on whether or not they felt the death penalty is a deterrent to crime. We find no error. *Castell v. State,* 250 Ga. 776, supra, (5a).

(g) The defendant elicited from one juror this response: "If you prove beyond a shadow of a doubt that the man did it, then I would say he deserved the death penalty." The defendant asked no further questions and moved that the juror be excused for cause. The trial court's refusal to do so is the basis of the defendant's fourteenth ground.

We find no error. The juror's statement failed to show that he "was committed to automatically vote for the death penalty if the defendant was convicted." *Mincey v. State,* supra, 251 Ga. at 264 (10). Thus, his excusal was not mandated.

(h) Another juror stated that although he had no opinion regarding the defendant, he had an opinion about the person who committed the crime; he thought it was a vicious crime and he felt "pretty bitter about it." However, he subsequently stated that he could disregard anything he might have heard about the case and base his decision solely on the evidence presented at trial. Thus, the trial court did not err by refusing to excuse this juror. *Tennon v. State,* 235 Ga. 594, 595-596 (220 SE2d 914) (1975). The defendant's fifteenth ground is meritless.

(i) The defendant asked potential juror number 11 if, not

knowing anything about the case, the juror would be more inclined to favor the death penalty or life imprisonment. The juror answered that he had always been in favor of the death penalty, that he thought it was the only deterrent to murder, and that this case had nothing to do with his feelings about it. The court then asked him if he was saying that he was presently leaning more toward the death penalty than life imprisonment in this case. The juror answered that he was not, that he would have to hear the facts, and that he could consider life imprisonment, as well as the death sentence, for the defendant. The sixteenth ground, in which the defendant contends that the court's refusal to excuse this juror was error, is without merit for the same reason as is the fourteenth ground.

(j) During its voir dire, the state informed a juror: "Sir, in this connection the state is seeking the death penalty against Victor Roberts, who is seated here, alleging that he is the perpetrator and the murderer of Mary Jo Jenkins." This statement was preparatory to the question, "Are you conscientiously opposed to capital punishment?" The defendant later objected to the state's characterization of the defendant as the alleged murderer. The overruling of this objection is the basis of the defendant's eighteenth ground. We find no error. *Lamb v. State,* 241 Ga. 10, 12 (243 SE2d 59) (1978).

(k) During the defendant's cross-examination of the informant, the defendant attempted to impeach the witness by asking him about his prior record. The state's objection was sustained. In his twentieth ground, the defendant contends that this ruling was error. We disagree. The rule in Georgia is that " '(a) witness cannot be discredited even by his own testimony that he has been convicted of an offense involving moral turpitude; it is necessary to introduce an authenticated copy of the record of the court in which he was convicted.' *Rewis v. State,* 109 Ga. App. 83, 85 (134 SE2d 875) (1964)." *Rolland v. State,* 235 Ga. 808, 811 (221 SE2d 582) (1976).

We note that the defendant was later able to prove in a proper manner that the informant was convicted in 1979 of theft by receiving. This ground is meritless.

(l) In his twenty-first ground, the defendant complains of the admission in evidence of five photographs. The admission of two of these is dealt with in Division 8 of this opinion. The objection by the defendant to one of the photographs was sustained and it was not admitted. The two remaining photographs show, respectively, the chest entry wound and the back exit wound on the victim's body. These photographs were relevant to the issues in the case and were not inadmissible for any reason proffered by the defendant. *Ramey v. State,* supra. This ground is meritless.

(m) Finally, the defendant's twenty-second ground alleges a fatal variance in that "the indictment alleges that the weapon was a .38 caliber handgun, whereas the proof was that the weapon was a .38 special, which is a different type of weapon."

We note that the weapon was variously referred to, among other things, as a "revolver," a "pistol," and a "gun." In any event, this ground is meritless. *DePalma v. State,* 225 Ga. 465 (3) (169 SE2d 801) (1969).

We conclude that the trial court did not err by denying the defendant's motion for new trial.

### Sentence Review

11. During the sentence phase of the trial, the only evidence introduced by the state were prior convictions on two indictments, one of which was in two counts charging burglary and felony theft by receiving, and the other of which was in one count charging felony theft by receiving. In his fourth enumeration of error, the defendant contends that he was not given timely and proper notice of this evidence in aggravation. See OCGA § 17-10-2 (Code Ann. § 27-2503).

Before the jury was selected and sworn, the state gave written notice to the defendant of the prior record of the defendant and of the state's intention to use it in aggravation of sentence. After the jury was selected, the defendant informed the court that he had received this notice, but that it was vague, because it did not state in what court the defendant had been convicted. The state responded that the defendant had been convicted in the Fulton Superior Court.

A 20-minute recess was then taken to allow the defendant to assimilate his requests to charge. On resumption of the proceedings, the state asked that the record reflect that the notice of prior convictions given to the defendant had been amended to include indictment numbers, the dates of the convictions, and the fact that one indictment was in two counts.[5] Thereafter, opening statements were made.

At the sentencing phase of the trial, the state sought to admit certified copies of the convictions. The defendant objected that they were irrelevant. Over this objection, they were admitted.

OCGA § 17-10-2 (a) (Code Ann. § 27-2503) provides that only such "evidence" as the state has "made known" to the defendant "prior to his trial" shall be admissible in aggravation. See *Bowden v. Zant,* 244 Ga. 260 (15) (260 SE2d 465) (1979).

The state clearly provided some kind of notice prior to trial. We

---

[5] The notices themselves, original and amended, are not in the record.

need not determine whether the notice was sufficiently specific to comply with OCGA § 17-10-2 (Code Ann. § 27-2503), however, since the only objection interposed to the state's proffer of its evidence in aggravation was that it was irrelevant. That objection was properly overruled. *Zant v. Stephens,* 250 Ga. 97 (297 SE2d 1) (1982); *Fair v. State,* 245 Ga. 868 (4) (268 SE2d 316) (1980).

"The purpose of [OCGA § 17-10-2 (Code Ann. § 27-2503)] is to allow a defendant to examine his record to determine if the convictions are in fact his, if he was represented by counsel, and any other defect which would render such documents inadmissible during the pre-sentencing phase of the trial." *Herring v. State,* 238 Ga. 288, 290 (232 SE2d 826) (1977). The defendant does not now contend that the convictions were not his or that he was not represented by counsel. See *Franklin v. State,* 245 Ga. 141 (5) (263 SE2d 666) (1980). Thus, the introduction of the prior convictions could not have rendered the sentence invalid on the basis that it was imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c)(1) (Code Ann. § 27-2537); *Mincey v. State,* supra, (17).

The defendant's additional contention, that the state must provide written notice, prior to trial, of which statutory aggravating circumstances the state intends to rely upon, is without merit. *Bowden v. Zant,* supra.

12. In his third enumeration of error, the defendant complains of the trial court's refusal to allow the defendant to present to the jury, at the sentencing phase of the trial, the testimony of the clerk of court regarding the number of death penalties imposed in Fayette County in the preceding 10 years. We find no error. *Wilson v. State,* 250 Ga. 630 (12) (300 SE2d 640) (1983); *Blake v. State,* 239 Ga. 292 (3) (236 SE2d 637) (1977).

13. In his sixth enumeration of error, the defendant contends that the imposition of the death penalty was arbitrary, capricious and discriminatory. Essentially, he proceeds directly from the observation that a black male from Atlanta was given the death penalty for the murder of a white female in neighboring, predominantly white, Fayette County, to the conclusion that the death sentence was the product of racial discrimination.

We disagree. Our review of the record convinces us that the death penalty in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c)(1) (Code Ann. § 27-2537).

14. The jury in this case found two statutory aggravating circumstances: "The offense of murder was committed while the offender was engaged in the commission of a burglary and the offense

of murder was committed while the offender was engaged in the commission of another capital felony, to wit: armed robbery." See OCGA § 17-10-30 (b) (2) (Code Ann. § 27-2534.1).

Pointing to the lack of evidence that any property was taken during the murder of Mary Jo Jenkins, the defendant contends, in his eleventh enumeration of error, that the evidence is insufficient to support either finding. We disagree.

"A person commits the offense of burglary when, without authority and with the *intent* to commit a felony or theft therein, he enters or remains within the dwelling house of another . . ." OCGA § 16-7-1 (Code Ann. § 26-1601). (Emphasis supplied.) Thus, to complete the crime of burglary, it is not necessary that a defendant actually commit a theft; it is sufficient if he enters without authority and with the intent to commit a theft or a felony. See, e.g., *Kinney v. State,* 155 Ga. App. 95 (1) (270 SE2d 209) (1980); *Smith v. State,* 130 Ga. App. 390 (2) (203 SE2d 375) (1973). In this case, the evidence was sufficient to demonstrate, not only that the defendant entered the home of Mrs. Jenkins unlawfully and with the intent to commit a theft therein, but also that, after the unlawful entry, he remained within the dwelling with the intent to commit the felony of murder. Compare *Phillips v. State,* 250 Ga. 336 (2) (297 SE2d 217) (1982). Thus, the evidence supports the jury's finding that the murder occurred during the commission of a burglary.

Concerning the other finding, this court has held that "[t]he 'while . . . engaged in the commission of' requirement of [OCGA § 17-10-30 (b)(2) (Code Ann. § 27-2534.1)] does not require that the subject felony shall have been completed . . ." *Amadeo v. State,* 243 Ga. 627, 630-31 (255 SE2d 718) (1979). The evidence was sufficient to authorize a finding that the defendant murdered Mrs. Jenkins while he was "engaged in the commission" of an armed robbery.

We conclude that the jury's finding of statutory aggravating circumstances was supported by the evidence. OCGA § 17-10-35 (c)(2) (Code Ann. § 27-2537).

15. The similar cases listed in the appendix support the death penalty in this case. "Our cases show that juries find the death penalty to be appropriate punishment where an adult defendant commits murder during an unlawful intrusion into a private home. See, e.g., *Horton v. State,* 249 Ga. 871 (14) (295 SE2d 281) (1982), and cases cited in the appendix." *Williams v. State,* 250 Ga. 553 (9) (300 SE2d 301) (1983). Our cases show, in addition, that juries find the death penalty to be appropriate where an adult defendant commits murder during the commission of an armed robbery.

In this case, the defendant, an adult with a prior record of burglary and theft, used a stolen automobile to transport himself to

Fayette County, where, using stolen articles to pose as an insurance salesman, he undertook to rob a victim, unknown to him, at a time of day when she would be expected to be at home, alone. After entry to the victim's home was gained by use of force, she was severely beaten about the head, and she was murdered as she screamed for help.

The sentence of death imposed in this case is not excessive or disproportionate to sentences imposed in similar cases.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 21, 1984 —
REHEARING DENIED MARCH 6, 1984.

*Kendall, Mangham & Kendall, Wayne B. Kendall,* for appellant.

*Johnnie L. Caldwell, Jr., District Attorney, J. David Fowler, Assistant District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis,* for appellee.

APPENDIX.

*Mincey v. State,* 251 Ga. 255 (304 SE2d 882) (1983); *Horton v. State,* 249 Ga. 871 (295 SE2d 281) (1982); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Dick v. State,* 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State,* 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Spivey v. State,* 241 Ga. 477 (246 SE2d 288) (1978); *Bowden v. State,* 239 Ga. 821 (238 SE2d 905) (1977); *Young v. State,* 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Callahan v. State,* 229 Ga. 737 (194 SE2d 431) (1972).