## S90P1326. STRIPLING v. THE STATE.

(401 SE2d 500)

BELL, Justice.

This is a death penalty case. The defendant, Alphonso Stripling, was a cook trainee at a fast food restaurant in Douglasville. Very soon after the restaurant closed for the day on October 15, 1988, Stripling shot four employees of the restaurant, killing two of them. He left with the restaurant's cash receipts, stole a getaway car at gunpoint, and was arrested a short time later after a high-speed chase. In his possession at the time of his arrest were the stolen car, the restaurant receipts, and the murder weapon.

Stripling was convicted by a jury in Douglas County on two counts each of murder, armed robbery and aggravated assault. The jury found in favor of a death sentence on each of the two murder counts. He appeals. We affirm the conviction and death sentences.[1]

1. There was no abuse of discretion in the denial of sequestered voir dire. *Sanborn v. State*, 251 Ga. 169 (3) (304 SE2d 377) (1983).

2. There was no abuse of discretion in the court's control of the voir dire examination. *Curry v. State*, 255 Ga. 215 (2) (336 SE2d 762)

---

[1] The crime occurred on October 15, 1988. On June 5, 1989, the defendant filed a special plea of incompetence to stand trial. The plea was tried before a jury on June 19 and 20, 1989, and the jury found against the plea. The trial of the case-in-chief began on June 21, 1989, and ended on July 1, 1989. A motion for new trial was filed August 9, 1989. The motion, as amended, was denied, after hearing, on April 27, 1990. The case was docketed in this court on July 10, 1990, and orally argued on September 19, 1990.

(1985). The court's rulings on the qualifications of prospective jurors respecting their attitudes for or against the death penalty were "within the deference due the trial judge's determination." *Jefferson v. State*, 256 Ga. 821, 824 (353 SE2d 468) (1987).

3. Stripling filed a special plea of incompetence to stand trial. See OCGA § 17-7-130. The special jury impanelled to hear that issue found Stripling competent to stand trial. At the trial of the case-in-chief, Stripling contended he was insane, mentally ill and mentally retarded. The court charged the jury on the possible verdicts of guilty, not guilty, not guilty by reason of insanity, guilty but mentally ill and guilty but mentally retarded. See OCGA § 17-7-131 (a) (3). On each count, the jury found Stripling guilty. At the sentencing phase of the trial, Stripling relied in large part on his mental condition in mitigation. The jury found in favor of capital punishment.

Stripling contends each of these verdicts is unsupported by the evidence and "the jury's verdicts of competency to stand trial, guilt and the sentence[s] of death must be vacated." Appellant's brief at 18.

### The Competency Trial

The defendant's expert witness testified that Stripling is mildly mentally retarded and is a "mild to moderate," chronic paranoid schizophrenic. However, Stripling was not psychotic, and was capable of cooperating with his attorneys; he understood the charges against him, the potential consequences of the trial, and could remember and discuss the facts of the crime.

The state's expert witness testified that Stripling was competent to stand trial. The state also presented the testimony of law enforcement witnesses who had the opportunity to observe and to converse with the defendant and who were of the opinion that Stripling was of normal and adequate intelligence, and did not seem to be suffering any serious mental disabilities.

A criminal defendant is competent to stand trial if he is capable of understanding the nature and object of the proceedings and is capable of assisting his attorney with his defense. *Brown v. State*, 215 Ga. 784 (1) (113 SE2d 618) (1960). There is no significant conflict in the evidence on this issue, and the evidence supports the special jury's finding that Stripling was competent to stand trial.

### The Guilt Phase of the Trial

Two experts testified on behalf of the defendant at the guilt phase of the trial. Both agreed that Stripling was not insane at the time of the crime, i.e., that Stripling had the "mental capacity to distinguish between right and wrong in relation to the act[s]" constitut-

ing the crime. OCGA § 16-3-2.

One of these witnesses, a licensed psychologist and cognitive therapist, administered a battery of tests, including an IQ test on which Stripling achieved a score of 64. This score was consistent with a previous score of 68 on a test administered to the defendant some years earlier while in prison. It was inconsistent, however, with an IQ score of 111 on another prison test. The psychologist thought Stripling probably had cheated on this test. In his opinion, Stripling is mildly mentally retarded. The witness conceded, however, that an IQ score is subject to some margin of error, that an IQ test contains at least some cultural bias which could affect the score, and that emotional factors, including depression, could also affect the score.

The other defense expert, a psychiatrist, relying largely on the results of the psychologist's testing, agreed that Stripling is mentally retarded. Both experts also concluded, based in part on Stripling's self-reported auditory hallucinations, as well as the results of the Minnesota Multiphasic Personality Inventory (MMPI), that Stripling is mildly schizophrenic, and that he was mentally ill at the time of the crime. See OCGA § 17-7-131 (a) (2) (defining "mentally ill"). There was no evidence of organic brain damage.

The state's expert did not agree that Stripling is either mentally ill or mentally retarded. He did not administer an IQ test for two reasons: (1) Stripling had recently been tested by the defense psychologist, and recent experience taking an IQ test can affect performance on the test, and (2) Stripling was severely depressed, and a score on a test administered to him while depressed would not have been a true indication of his intellectual ability. Based on his interviews with the defendant, and taking into consideration the adaptive skills demonstrated by the defendant, he concluded that the defendant is not mentally retarded.

He also concluded that Stripling was not "mentally ill" as that term is defined by OCGA § 17-7-131 (a) (2). He noted that Stripling scored "exceedingly high" on the "F" or "fake" scale on MMPI tests administered to Stripling by both this witness and by the defense psychologist. Unlike the defense witnesses, he was unable to attribute the high "fake" score to the defendant's mental illness. Instead, he concluded that Stripling "was trying to make himself appear more mentally ill than he probably is."

Our Code provides that "the term 'mental illness' shall not include a mental state manifested only by repeated unlawful or antisocial conduct." OCGA § 17-7-131 (a) (2). Stripling was convicted three times previously for armed robbery — in 1973, 1979 and 1980. In addition, the 1988 crime on trial here included charges of armed robbery and murder. One of the defense experts conceded that this record "sound[s] like repeated unlawful antisocial conduct." The other ex-

pert conceded that if the defendant had acted on his own during one of the prior armed robberies — and the evidence shows he did — "it would make a difference" in his conclusion that the defendant is mentally retarded.

(a) The jury was entitled to conclude from the evidence either that Stripling did not have a "disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life," or that his mental state manifested itself only by "repeated unlawful or antisocial conduct," or both. OCGA § 17-7-131 (a) (2). The jury was entitled to conclude that Stripling was not mentally ill. *Spivey v. State*, 253 Ga. 187, 188-89 (1, 2) (319 SE2d 420) (1984); *Hood v. State*, 187 Ga. App. 88 (369 SE2d 348) (1988).

(b) Stripling argues it is "clear" he is mentally retarded, and the "evidence simply does not support any other conclusion." We disagree.

Our statutory definition of "mentally retarded" is consistent with that supplied by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (Third Edition 1980) (hereinafter DSM III). The essential features of mental retardation are (i) significantly subaverage general intellectual functioning, (ii) resulting in or associated with impairments in adaptive behavior, and (iii) manifestation of this impairment during the developmental period. OCGA § 17-7-131 (a) (3).

"Significantly subaverage intellectual functioning" is generally defined as an IQ of 70 or below. DSM III, supra at 36. However, an IQ test score of 70 or below is not conclusive. At best, an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate. Moreover, persons "with IQs somewhat lower than 70" are not diagnosed as being mentally retarded if there "are no significant deficits or impairment in adaptive functioning." DSM III, supra at 37.

The evidence in this case does not demand a finding that Stripling is mentally retarded. The state's expert concluded to the contrary, and his testimony and other evidence in the case, as well as the state's cross-examination of the defendant's experts, provide a rational basis for the jury's verdict.

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence supports the jury's conclusion that Stripling is not mentally retarded. *Spivey v. State*, supra; *Hood v. State*, supra.

(c) Aside from any question of mental illness or mental retardation, the evidence overwhelmingly supports Stripling's conviction on all counts. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

## The Sentencing Phase

The defendant's argument that the sentences of death must be vacated is premised on his contention that the evidence admits of no conclusion but that he is mentally retarded. Since we hold to the contrary, this argument fails. Compare OCGA § 17-7-131 (j).

4. At the competency trial, the state peremptorily challenged two black prospective jurors and accepted one. Assuming, as the defendant contends, that the circumstances establish prima facie a claim under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), the trial court's determination that the prosecutor successfully rebutted the prima facie case is entitled to "great deference" and is not clearly erroneous. See, e.g., *Foster v. State*, 258 Ga. 736 (2) (374 SE2d 188) (1988).

5. The defendant was not entitled to review the prosecution's jury records. *Wansley v. State*, 256 Ga. 624 (2) (352 SE2d 368) (1987).

6. During the voir dire phase of the trial, an assistant district attorney accepted an invitation to have lunch with the sheriff and several law officers in the library of the Douglas County jail. The assistant district attorney discovered after his arrival that the defendant also had been invited. The defendant was the only jail inmate dining with the group, but two or three others were present to serve the meal.

After lunch, the defense attorney discovered what had happened, and moved to disqualify the district attorney and the members of his office, and to bar further prosecution of the case. The court denied the motion.

Stripling contends the state's conduct violated his right to counsel in violation of the rule of *Massiah v. United States*, 377 U. S. 201 (84 SC 1199, 12 LE2d 246) (1964). In *Massiah*, the defendant's right to counsel was held to have been violated when, after he was indicted, incriminating statements were elicited from him in the absence of counsel. See *Ross v. State*, 254 Ga. 22, 26, fn. 3 (326 SE2d 194) (1985).

Stripling concedes he was not interrogated at this luncheon, and that the case was not discussed. He argues that the state's conduct was "not designed to elicit incriminating words but rather incriminating action"; i.e., how he functioned in jail.

Stripling, however, was in custody during and for several months preceding the trial. During at least part of this time, he had been under a "suicide watch." The state had ample opportunity to observe the defendant and how he functioned in jail. The record does not show that, by eating with the defendant, the assistant district attorney gained knowledge about the defendant that was not otherwise readily available. Thus, we conclude there is not reversible merit to the constitutional issue raised by the defendant. We must add, how-

ever, that it ought to be obvious that a prosecutor should not dine with a criminal defendant without the knowledge of his attorneys while the case is being prosecuted. What occurred is a dangerous practice, and one we disapprove.

7. Stripling sought a pre-trial in-camera review of his parole file and the parole files of his father and brother.

Records in the possession of the State Board of Pardons and Paroles are confidential. OCGA § 42-9-53. However, we have recognized that, in limited circumstances, the non-disclosure provisions of OCGA § 42-9-53 must give way to the defendant's right of access to potentially mitigating evidence. *Pope v. State*, 256 Ga. 195, 212 (22) (345 SE2d 831) (1986). Accord *Pennsylvania v. Ritchie*, 480 U. S. 39 (107 SC 989, 94 LE2d 40) (1987). Thus, we have held that, on request, a trial court should review the defendant's parole file in camera, and disclose potentially mitigating evidence to the defendant that he does not otherwise have ready access to. *Pope v. State*, supra; *Walker v. State*, 254 Ga. 149 (4) (327 SE2d 475) (1985). We have not, however, held that the trial court must review in camera the parole files of persons other than the defendant. *Isaacs v. State*, 259 Ga. 717 (12) (386 SE2d 316) (1989). As has been noted, an "in camera inspection can become a 'ponderous, time consuming task if utilized in every case merely on demand.' [Cit.]" LaFave & Israel, Criminal Procedure, Vol. 2, § 19.5 at p. 546 (1984). We hold that at least in the absence of a reasonably specific request for relevant and competent information, the trial court may decline to conduct an in-camera inspection of parole files of persons other than the defendant.

The trial court reviewed Stripling's parole file and determined there was no potentially mitigating evidence in the file not already known to and available to the defendant. We have reviewed the file and find no error in the non-disclosure of the defendant's parole file. *Walker v. State*, supra.

The trial court did not review the parole files of the defendant's brother or father. Since the defendant's request for such a review contained no more than speculation that these files might contain material evidence in mitigation, the court's refusal to review these files was not erroneous.

8. There is no merit to the defendant's claim that electrocution is cruel and unusual punishment prohibited by the Federal and Georgia Constitutions. *Isaacs v. State*, 259 Ga., supra at 722 (7).

9. (a) During the voir dire examination, the defense asked a panel of prospective jurors if any of them had a "fear of firearms." The trial judge interjected: "I don't fear the firearm, I fear the nut that's holding it." On objection by the defendant, the court conceded the remark was improper, apologized for making it, and told the prospective jurors not to let it influence them in any way.

We agree with the defendant that the remark was improper, but find that the court's response was sufficient to cure any potential harm resulting from the improper remark.

(b) Contrary to the defendant's contention, the trial court did not tell prospective jurors that the case had been "*well* investigated." The court simply noted the case had been "investigated" while explaining to the prospective jurors, before dismissing them for the weekend, that they had no investigative duties and should not discuss the case with anyone, nor read about the case in the newspapers. These instructions were not erroneous.

(c) Near the conclusion of the guilt phase of the trial, the trial court told the jury that the law did not allow jurors to question witnesses, pointing out that a "judge down in south Georgia" let jurors ask "a couple of questions of a witness" and the "Court of Appeals reversed him, and, you know, when you have to try a case a second time it's about like eating cold collards."

The defendant contends this was an impermissible reference to appellate review.

In *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985), the U. S. Supreme Court vacated a death sentence where the prosecutor had argued that if the jury's sentencing verdict was unfair it could be corrected by an appellate court. See also, e.g., *Prevatte v. State*, 233 Ga. 929 (6) (214 SE2d 365) (1975). In these cases, the jury was misled about the nature of appellate review and the argument tended to lessen the jury's sense of responsibility for its verdict.

The remarks in this case did not "attach diminished consequence to [the jury's] verdict" nor encourage the jury "to take less than full responsibility" for its verdict. *Prevatte v. State,* supra at 931. See also *Kimbrough v. State,* 254 Ga. 504, 506 (3) (330 SE2d 875) (1985); *Ingram v. State,* 253 Ga. 622, 637 (17) (323 SE2d 801) (1984). There was no reversible error.

10. There is no requirement to sequester a competency-trial jury, even in a death penalty case. *Willis v. State,* 243 Ga. 185 (5) (253 SE2d 70) (1979).

11. No victim-impact evidence was introduced in violation of *Booth v. Maryland,* 482 U. S. 496 (107 SC 2529, 96 LE2d 440) (1987).

12. Stripling's 16th enumeration is controlled by *Putman v. State,* 251 Ga. 605, 614 (12) (308 SE2d 145) (1983), wherein we held:

[T]he doctrine of "mutually supporting aggravating circumstances" precludes imposition of *two* death sentences where the sole statutory aggravating circumstance is that the defendant has committed a double murder. [Cits.] Nonetheless, where, as here, each murder conviction is supported by an

independent statutory aggravating circumstance (in this case, armed robbery), the jury may impose the death penalty for each murder. [Cit.] In such cases, that the jury has designated each murder as a statutory aggravating circumstance supporting the death penalty for the other does not require the reversal of either death sentence. [Cit.]

13. Ground 38 of Stripling's motion for new trial alleged:

That . . . conversations between the defendant and his attorneys which occurred in the Douglas County Jail pre-trial, during the trial, and post-trial, were electronically monitored by agents of the Douglas County Sheriff's Department, in violation of the defendant's rights under the 5th, 6th, 8th and 14th Amendments to the United States Constitution, the correllative provisions of the Constitution of the State of Georgia, and both State and Federal statutory and case law.

Hearings were conducted on these allegations. One of the witnesses was a reporter for the Fulton County Daily Report, who had written an article based on information from "confidential sources" allegedly reporting "precise details on a systematic policy of eavesdropping" of attorney-client communications at the Douglas County jail.

The reporter was called as a witness by the defendant. She declined to reveal the identity of her confidential sources (described in the article as "three former employees of the Douglas County Sheriff's Department"), relying on the recently enacted "shield law" creating for members of the news media a qualified privilege against the disclosure of information. The law, OCGA § 24-9-30, provides:

Any person, company, or other entity engaged in the gathering and dissemination of news for the public through a newspaper, book, magazine, or radio or television broadcast shall have a qualified privilege against disclosure of any information, document, or item obtained or prepared in the gathering or dissemination of news in any proceeding where the one asserting the privilege is not a party, unless it is shown that this privilege has been waived or that what is sought:
(1) Is material and relevant;
(2) Cannot be reasonably obtained by alternative means; and
(3) Is necessary to the proper preparation or presentation of the case of a party seeking the information, document, or item.

The trial court allowed the reporter to invoke the privilege except as to information already publicly disclosed, in the article or elsewhere (and as to which the privilege was waived). The reporter was not required to reveal the identities of her informants.

(a) The defendant contends it was error to allow the reporter to invoke the privilege. We disagree. Assuming the information was "material and relevant," and "necessary to the proper preparation . . . of the case . . .," the defendant failed to show that the information could not have been "reasonably obtained by alternative means." OCGA § 24-9-30. The evidence shows that there were fewer than a dozen former employees of the sheriff's office in the relevant time period, and that the defense team made no effort to contact any of them. The trial court did not err by allowing the reporter to invoke the privilege. Compare *Zerilli v. Smith*, 656 F2d 705 (D.C. Cir. 1981).

(b) The defendant contends the trial court erred by not granting his motion for new trial on the ground that his attorney-client communications were monitored by jail personnel. The evidence, however, which includes testimony by the sheriff and his staff, fails to establish a violation of the defendant's attorney-client privilege. The court's denial of the defendant's motion for new trial was not erroneous.

14. Error, if any, in allowing a state's exhibit to be displayed to the jury with a label on it showing the chain of custody, was harmless.

15. The court's instructions defining mitigating circumstances were sufficient. *Davis v. State*, 255 Ga. 598, 612 (22) (340 SE2d 869) (1986).

16. The evidence supports the jury's findings of statutory aggravating circumstances. OCGA § 17-10-35 (c) (2).

17. We do not find that Stripling's death sentences were imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentences are not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death sentences in this case.

*Judgment affirmed. Clarke, C. J., Smith, P. J., Bell, Hunt, Benham, Fletcher, JJ., and Judge G. Mallon Faircloth concur; Weltner, J., not participating.*

### Appendix.

*Lee v. State*, 258 Ga. 762 (374 SE2d 199) (1988); *Frazier v. State*, 257 Ga. 690 (362 SE2d 351) (1987); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d

420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State*, 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State*, 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State*, 233 Ga. 117 (210 SE2d 659) (1974).

DECIDED FEBRUARY 22, 1991 —
RECONSIDERATION DENIED MARCH 15, 1991.

*Michael R. Hauptman, John A. Beall IV*, for appellant.
*Frank C. Winn*, District Attorney, *Michael J. Bowers*, Attorney General, *Mary H. Hines*, for appellee.
*Long, Aldridge & Norman, Albert G. Norman, Jr., Bruce P. Brown*, amici curiae.