## S98P1870. COOK v. THE STATE.
### (514 SE2d 657)

HINES, Justice.

Andrew Allen Cook was found guilty of two counts of malice murder and two counts of felony murder in the shooting deaths of Grant Patrick Hendrickson and Michele Lee Cartagena, and was sentenced to death for one of the murders. The jury recommended a death sentence for Cook's murder of Ms. Cartagena after finding that the murder of Ms. Cartagena was committed while the defendant was engaged in the commission of the murder of Mr. Hendrickson. OCGA § 17-10-30 (b) (2). Cook appeals and we affirm.[1]

1. The evidence adduced at trial shows the following: at approximately midnight on January 2, 1995, Mercer University students Hendrickson and Cartagena were parked on a small peninsula known as "the Point," which juts into Lake Juliette in Monroe County, north of Macon. Cook drove onto the Point, parked his Honda CRX near Hendrickson's and Cartagena's car, and shot them. Cook fired fourteen times with an AR-15 rifle from a distance of about forty feet and then moved closer and fired five times with a nine millimeter Ruger handgun. Hendrickson and Cartagena were each hit multiple times and killed. Cook then went to the passenger side of the victims' car, removed Cartagena, and dragged her about 40 feet. He partially undressed her, knelt between her legs, and spit on her. Cook then drove away. The murders were completely random: Cook did not know the victims and there was no interaction between Cook and the victims before he killed them.

Several people parking or camping around Lake Juliette heard the shots, and the murders were reported to the police the next morning when some campers found the bodies. A couple parked near the Point when the shots were fired said they saw a 1980s-model Honda CRX parked near the entrance to Lake Juliette. Later, they saw headlights going onto the Point, heard shots, and observed the CRX speeding away from the Point. The police recovered .223 caliber and nine millimeter bullets and shell casings from the crime scene, and the State Crime Lab reported that the weapons used in the

---

[1] The murders were committed on January 2 or 3, 1995. The grand jury indicted Cook for malice murder (2 counts), felony murder (2 counts), and armed robbery on February 17, 1997, and the state filed its notice of intent to seek the death penalty on February 27, 1997. The trial took place from March 9-19, 1998. During the trial, the state withdrew the armed robbery charge, and on March 19, 1998, the jury convicted Cook of the remaining counts and recommended a death sentence for the murder of Ms. Cartagena. In addition to the death sentence, the trial court sentenced Cook to a consecutive life sentence for the murder of Mr. Hendrickson. Cook filed a motion for new trial on March 23, 1998, which was supplemented on June 4, 1998, and denied on July 10, 1998. Cook filed a notice of appeal on July 31, 1998, and the case was docketed on August 19, 1998. The case was orally argued on November 10, 1998.

murders were probably an AR-15 rifle and a nine millimeter Ruger handgun. There was saliva mixed with tobacco dried on Cartagena's leg, and the Crime Lab extracted DNA from the saliva. The police began looking for suspects who chewed tobacco, matched the DNA taken from the saliva, and owned or had access to a Honda CRX, an AR-15 rifle, and a nine millimeter Ruger pistol.

The investigation lasted almost two years. Many people were interviewed and dozens of suspects were excluded after they submitted blood or saliva samples to the Crime Lab, or allowed their weapons to be examined by a state firearms expert. In the fall of 1996, GBI Agent Randy Upton began tracking the purchasers of AR-15 rifles in the Macon area. He obtained a list of 108 people who bought AR-15 rifles from 1985 to 1995 from one of Macon's most popular gun stores, and he started calling them and asking if they would give saliva samples and allow examinations of their rifles. On November 27, 1996, Agent Upton contacted Cook. Agent Upton told Cook he was conducting an investigation into the Lake Juliette murders and that Cook owned an AR-15 rifle in 1994 and 1995. Cook replied that he had "gotten rid of" his AR-15 in April 1994. Agent Upton stated that that was not possible because the records show that Cook did not buy his AR-15 until August 1994. Cook then became defensive and stated that his father was an FBI agent, and he did not have to cooperate. Agent Upton asked for a saliva sample, and Cook said he needed to talk with his father before giving a saliva sample. The conversation ended.

Agent Upton learned that Cook pawned his AR-15 rifle back to the gun store in May 1995, five months after the murders. The police also discovered that Cook had an acquaintance purchase a nine millimeter Ruger handgun for him in December 1993 at the same gun store, because Cook was too young to buy it himself. Cook sold the Ruger to a friend in July 1995. The police sought to obtain these weapons from their current owners. They also learned that Cook owned a 1987 Honda CRX at the time of the murders.

One of Cook's friends, who worked with Cook at a diaper factory, testified that in late November 1996 he and Cook had a conversation about "the worst thing you ever did." Cook said he had killed someone with an AR-15. The friend did not believe Cook, but asked why he did it. Cook replied that he did it "to see if I could do it and get away with it." Cook refused to provide any more details. The friend testified that the following day at work, Cook received a call on his pager, and left his work area to return the call. Cook returned 15 minutes later and was "as white as a ghost." Cook said "I got to go," and spit the tobacco he had been chewing into a trash can. Cook said it was the GBI who had called and they wanted to question him about what he and the friend had talked about the day before, and

test his saliva. He said, regarding the saliva, "that's a DNA test right there, so they got my ass." Another friend testified that Cook told him in late November 1996 that he needed to leave town because it was "getting hot."

After going to Cook's home and not finding him, Agent Upton called Cook's father, John Cook, on December 4, 1996. John Cook was an FBI agent and had been an FBI agent for 29 years. Agent Upton said he needed to ask Cook a few questions regarding the Lake Juliette murders, and asked John Cook for assistance in locating him.[2] John Cook said he could probably contact his son. John Cook, who knew about the case from the media but had not worked on it, testified that he did not think his son was a suspect.

John Cook paged his son several times and at 11:00 p.m. Cook returned his calls. John Cook told his son the GBI was looking for him concerning the Lake Juliette murders and asked him if he knew anything about them. Cook replied, "Daddy, I can't tell you, you're one of them . . . you're a cop." John Cook said he was his father first and, believing his son may have been a witness, asked Cook if he was there during the shooting. Cook said yes. John Cook asked his son if he saw who shot them, and Cook replied yes. Although he still thought "maybe he was just there and saw who shot them," John Cook asked his son if he shot them. After a pause, Cook said yes. Cook told his father he was fishing at Lake Juliette and had an argument with the male victim. The male victim threatened him with a gun, and Cook shot the victims in self-defense. Cook realized that the male victim had only threatened him with a pellet gun, and he threw the pellet gun into the woods. John Cook urged his son to go to the authorities but Cook said he was going to run and "just disappear." John Cook was worried that his son was going to kill himself.

John Cook was stunned by what his son had told him. After speaking with his wife, he called his friend and FBI supervisor, Tom Benson, who was at a conference in New Orleans. He and Benson decided that Benson would fly back to Georgia the next day and the two men would go to Monroe County Sheriff John Bittick, and John Cook would tell the sheriff what his son had told him. They arrived at the Monroe County sheriff's office at about 4:00 p.m. on December 5, 1996.

At about 11:45 a.m. on December 5, 1996, Cook was arrested by a game warden for shooting deer and turkeys out of season and giving a false name. He was taken to the Jones County sheriff's office. Agent Upton, who did not know about Cook's admission to his father,

---

[2] Cook did not live with his parents; he was 20 years old when he committed the murders.

learned that Cook was being held in Jones County for game violations. He drove to Jones County to question Cook about the Lake Juliette murders. When Agent Upton introduced himself and asked to speak with him about the murders, Cook blurted, "it's been two years since the murders and you guys don't have anything; I had a CRX; I had an AR-15; I had a Ruger P89; you guys are going to try to frame me." Cook added, "get my father and get me [a] lawyer and I'll tell you what you want to hear." The interview terminated. Agent Upton subsequently learned from Sheriff Bittick that John Cook was in Monroe County, and that Cook had made an admission to his father the night before. Agent Upton transported Cook to Monroe County.

After Cook arrived at the Monroe County sheriff's office, John Cook asked Sheriff Bittick if he could speak with his son, and the sheriff agreed. Cook and his father had a private meeting. Both men were crying and John Cook hugged his son. John Cook told his son he did not believe that he told the whole truth on the phone. Cook replied that there was no pellet gun, that "I pulled in, the car was already there, and I just stopped and shot them." Cook then dragged the female victim from the car to make it look like an assault or robbery. John Cook testified at trial about his son's admissions.

The police recovered from the current owners the AR-15 rifle and nine millimeter Ruger handgun that Cook owned in January 1995. Ballistics testing revealed that they were the murder weapons. Cook's DNA matched the DNA extracted from the saliva on Cartagena's leg; the state DNA expert testified that only one in twenty thousand Caucasians would exhibit the same DNA profile.

The evidence was sufficient to enable a rational trier of fact to find Cook guilty of two counts of malice murder and two counts of felony murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to enable the jury to find the existence of the statutory aggravating circumstance beyond a reasonable doubt. Id.; OCGA § 17-10-35 (c) (2).

2. Cook claims that the trial court erred by ruling that his December 5, 1996 statement to his father was admissible. He asserts that the statement should have been suppressed because it was made to his FBI agent-father when he had not been read his *Miranda (v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966)) rights, and after he had requested a lawyer. The record is clear that no one read Cook his *Miranda* rights on December 5, and that Cook invoked his right to counsel when Agent Upton sought to question him in Jones County. However, the trial court found that "[a]ll the statements were freely and voluntarily given, and were more in the nature of a father-son exchange at a time when the defendant had

expressed some desire to see his father about the events that had transpired." The trial court also found that Cook's father did not speak to his son at the behest of the GBI or the sheriff or any other law enforcement officer, and no trickery, deceit, or promises were involved. According to the trial court, "[t]he facts in this case differ from the usual custodial interrogations by police officers seeking confessions from a person charged in a crime." Factual and credibility determinations made by a trial court after a *Jackson v. Denno* (378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964)) hearing will not be disturbed on appeal unless clearly erroneous. *Dixon v. State*, 267 Ga. 136, 139 (3) (475 SE2d 633) (1996).

The evidence regarding the circumstances of Cook's December 5 statement to his father shows the following: before Agent Upton read Cook his *Miranda* rights, Cook demanded his father and a lawyer; neither Agent Upton nor any other investigator in the case attempted to interrogate Cook after this invocation of his right to counsel; Agent Upton learned that John Cook was in Monroe County and that Cook had made an admission regarding the murders the night before; and Agent Upton told Sheriff Bittick that Cook had invoked his right to counsel and asked to see his father. The record does not show that Sheriff Bittick told John Cook his son wanted to speak with him, but Sheriff Bittick did contact the district attorney on December 5 regarding the procurement of a lawyer for Cook. Agent Upton transported Cook to Monroe County.

After Cook arrived at the Monroe County sheriff's office, John Cook asked to speak with his son. John Cook testified that he "wanted to know what happened" and that, though it is difficult to separate out the law enforcement part of his personality, he wanted to speak to his son mostly as a father ("I was still not thinking in my mind directly and openly that I was an agent with the FBI"). John Cook testified he was not intent on gathering evidence for the state; instead, he wanted "to try to persuade Andy to cooperate in hopes of getting a reduced sentence." However, John Cook also testified that he was not going to keep any incriminating evidence to himself, and that he had no doubt he would pass on additional information to the investigators. Neither Sheriff Bittick nor any other law enforcement agent asked him to speak with his son. Sheriff Bittick testified that John Cook was a personal friend he had known professionally for a number of years. He also testified that he sometimes permits parents to speak with their children in custody when he feels it is the right thing to do, and not for the purpose of gathering evidence.

Sheriff Bittick entered the office where Cook was being held and told Cook that "his Daddy wanted to talk to him." Cook said, "okay." John Cook and his son were left alone in an office; Cook was not handcuffed. Both men were crying and shaking; John Cook hugged

his son. John Cook testified that it was not a normal interview but he asked specific questions about the murders and elicited specific answers from Cook. John Cook said this is typical of a conversation with his son, that Cook "does not volunteer anything. If you have a conversation with him you will do 90 percent of the talking." Cook, however, was not reluctant to talk. John Cook also told his son that "the best thing for us to do was cooperate and see if we couldn't get some kind of a plea bargain to a reduced sentence." Sheriff Bittick testified that, after the father-son conversation, John Cook sat in his office for several minutes, upset and crying. John Cook then spontaneously told Sheriff Bittick what his son had just told him regarding the murders. Sheriff Bittick did not ask any questions about the conversation.[3]

The Fifth Amendment specifies that no person shall be compelled in a criminal case to be a witness against himself. In *Miranda*, the United States Supreme Court formulated procedural safeguards to ensure that the inherently compelling nature of an in-custody interrogation by the police will not undermine the suspect's will to resist and force him to speak "where he would not otherwise do so freely." *Miranda*, 384 U. S. at 467. One of these safeguards is the rule that once an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U. S. 477, 484-485 (101 SC 1880, 68 LE2d 378) (1981). The Supreme Court has defined interrogation or its functional equivalent as express questioning by law enforcement officers or " 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Arizona v. Mauro*, 481 U. S. 520, 526-527 (II) (107 SC 1931, 95 LE2d 458) (1987), quoting *Rhode Island v. Innis*, 446 U. S. 291, 301 (100 SC 1682, 64 LE2d 297) (1980).[4] The Supreme Court has expressed particular concern about deceit or trickery during a police interrogation, such as using psychological ploys like a "reverse line-up," to subjugate the individual to the will of the examiner. See *Mauro*, 481 U. S. at 526; *Innis*, 446 U. S. at 299. However, the Supreme Court has made clear that "[i]n deciding whether particular police conduct is interrogation, we must

---

[3] John Cook attempted unsuccessfully to persuade the district attorney to accept a guilty plea for a sentence less than death. At trial, he testified for the state in the guilt-innocence phase and for his son in the sentencing phase.

[4] We need not discuss the "custodial" aspect of "custodial interrogation" as the parties concede that Cook was in custody on December 5 when he spoke with his father.

remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Mauro*, supra at 529-530. "[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *United States v. Washington*, 431 U. S. 181, 187 (97 SC 1814, 52 LE2d 238) (1977).

The coercion proscribed by *Miranda* must be caused by the police. *Colorado v. Connelly*, 479 U. S. 157, 170 (107 SC 515, 93 LE2d 473) (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."). "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" Id., quoting *Oregon v. Elstad*, 470 U. S. 298, 305 (105 SC 1285, 84 LE2d 222) (1985). Numerous cases hold that *Miranda* is not implicated when a suspect in custody is questioned or encouraged to confess by a father, mother, wife, or girl friend. See, e.g., *Arizona v. Mauro*, 481 U. S. 520 (no interrogation under *Miranda* when suspect's wife spoke with suspect about murder with a police officer present and recording the conversation, after the suspect had invoked his right to counsel); *United States v. Gaddy*, 894 F2d 1307, 1309-1311 (11th Cir. 1990) (no *Miranda* violation when suspect's aunt, who was a police officer, called suspect in jail after he invoked his right to counsel and persuaded him to confess); *Snethen v. Nix*, 885 F2d 456, 457-460 (8th Cir. 1989) (accused not interrogated under *Miranda* when his mother, who gained access to him in prison by telling officers "if [my son] did this, he will tell me," exhorted accused to confess so her other son would not be unjustly punished); *Lowe v. State*, 650 S2d 969, 972-974 (Fla. 1994) (suspect not interrogated under *Miranda* when suspect's girlfriend sought and was granted access to suspect after he had invoked his right to counsel, and she persuaded him to confess); *Buttersworth v. State*, 260 Ga. 795, 797-799 (2) (400 SE2d 908) (1991) (no *Miranda* violation when suspect's father elicited location of body from in-custody suspect and told sheriff); *State v. Massey*, 342 SE2d 811, 822 (N.C. 1986) (suspect not subjected to custodial interrogation under *Miranda* when suspect's father asked him at jail in the presence of a police officer if he shot the victim and suspect admitted it).

The difficulty in this case arises from the fact that John Cook was both an FBI agent and the suspect's father. Adopting Cook's argument that, due to his father's career, the conversation he and his father had at the Monroe County sheriff's office is a per se custodial interrogation would not be reasonable; such a holding would require us to presume that law enforcement parents would place their parent-child relationship subordinate to their employer-employee rela-

tionship, that a law enforcement parent would automatically coerce a confession from his or her own child. It is perfectly natural and reasonable for a parent, law enforcement or civilian, to speak to his or her arrested child about an alleged crime and give advice that may include cooperating with the police and confessing. However, we can envision situations where a law enforcement parent might subject his or her arrested child to a custodial interrogation within the meaning of *Miranda*. Therefore, we conclude that this issue must be resolved on a case-by-case basis, by viewing the totality of the circumstances, in order to determine if the law enforcement parent was acting as a parent or as an agent of the state when speaking with his or her arrested child.

*United States v. Gaddy*, 894 F2d at 1309-1311, is analogous to Cook's case. In *Gaddy*, Gaddy's co-defendant, William Danner, was arrested by the Chatham County police for possession of a firearm by a convicted felon and theft by taking. Danner invoked his right to counsel. Gaddy was also arrested for a parole violation after the police began to suspect that Gaddy and Danner might have committed a murder together. Danner's aunt, Janice Hernandez, was a police officer in the Chatham County police department, and she was apprised by a superior about the case involving her nephew. The detective working the case also told her it would be in Danner's best interest if he cooperated. However, no one requested that Officer Hernandez speak with Danner. Officer Hernandez, acting on her own, called Danner in jail and urged him to confess. Danner agreed, his aunt set up a meeting between Danner and the investigators, and Danner made a full confession. Danner's motion to suppress this statement was denied, and he appealed after he was convicted of kidnapping. The Eleventh Circuit Court of Appeals found no violation of *Miranda* or *Edwards* when Officer Hernandez contacted her nephew and persuaded him to confess because Officer Hernandez did not act as "an agent of the government but . . . as a private citizen." Id. at 1311. In making this determination the Eleventh Circuit considered the following factors: 1) Officer Hernandez was not part of the investigative team on Gaddy's or Danner's case; 2) she was not directed by a superior to speak with Danner; 3) she acted solely out of concern for his welfare; and 4) she was not acting in the normal course of her duties when she contacted him. Id. She was a "worried aunt" who "communicated with Danner, not to assist the police department in solving a crime, but to protect her nephew." Id.

An analysis of Cook's case reveals the following: 1) John Cook was not part of the investigative team on the Lake Juliette murders (in fact, the FBI did not have jurisdiction to investigate the case); 2) Cook asked to see his father at the same time he requested an attorney; 3) John Cook was not directed by any law enforcement agent

connected with Cook's case to speak to his son — he made the request on his own initiative; 4) John Cook's motive in speaking with his son was to urge him to cooperate in the hope of getting a plea bargain; and 5) the interview involved hugging and crying by father and son which is not typical of a police interrogation. Under these circumstances, we conclude that the trial court did not err by finding that John Cook acted as a father and not as an agent of the state when he met with his son on December 5. See *Gaddy*, supra. Further, the meeting between John Cook and his son was devoid of any trickery, deceit, or other psychological ploy. Viewed from the defendant's perspective, "[w]e doubt that [Cook], [after requesting to see his father and] told by officers his [father] will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." *Mauro*, 481 U. S. at 528. Since the evidence shows a lack of governmental coercion, Cook's December 5 statement to his father was admissible under *Miranda* and *Edwards*. See *Mauro*, supra at 529-530; *Gaddy*, supra. The evidence also shows that Cook's December 5 statement to his father was voluntary under OCGA § 24-3-50. *Griffin v. State*, 230 Ga. App. 318, 320 (496 SE2d 480) (1998) (when confession is made to a witness who is not a state agent, it must still be voluntary under OCGA § 24-3-50).

3. On several occasions during trial, the trial court prevented Cook from cross-examining state witnesses about whether Cook was read his *Miranda* rights and other issues that may relate to the voluntariness of his statements under OCGA § 24-3-50. This was error as the defense retains the right, regardless of a pretrial determination by the trial court that a statement was voluntary, to present testimony and cross-examine witnesses regarding the circumstances surrounding the voluntariness of a confession. See *Crane v. Kentucky*, 476 U. S. 683, 688-690 (106 SC 2142, 90 LE2d 636) (1986); *Griffin*, 230 Ga. App. at 324. However, after a review of the evidence presented at the *Jackson v. Denno* hearing and at trial, we conclude that the error is harmless. The jury heard extensive evidence about the environment in which Cook made his admissions, and there is no evidence that Cook was induced to make his admissions by a hope of benefit or fear of injury. OCGA § 24-3-50.

4. There is no reversible error in the trial court's failure to give Cook's requests to charge in the guilt-innocence phase.

5. Cook claims that the trial court erred by refusing to permit hearsay testimony under the necessity exception to the hearsay rule. OCGA § 24-3-1 (b). At trial, Cook wanted to question GBI Agent Mansfield about a statement made to him by Jason Hurt. According to Cook, Hurt was unavailable to testify because he was on the run from a probation violation. Cook claimed that Hurt told Agent Mansfield that John Weigand had admitted committing the murders to

him, and that Hurt had seen Michele Cartagena's driver's license (which was missing from the crime scene) at Weigand's home.[5] "To qualify as a necessity exception to the hearsay rule, there must be a necessity for the exception and a circumstantial guaranty of the testimony's trustworthiness." *Perkins v. State*, 269 Ga. 791, 795 (4) (505 SE2d 16) (1998); see also *McKissick v. State*, 263 Ga. 188, 189 (3) (429 SE2d 655) (1993). Pretermitting whether the evidence was sufficient to show that Hurt was unavailable to testify, we conclude that the trial court did not err by finding that there was an insufficient guaranty of trustworthiness. Hurt recanted his statement incriminating Weigand in a second statement to Agent Mansfield the very next day. See *Perkins*, supra at 796 (4); *McKissick*, supra. Hurt also said in his second statement that he now believed that the driver's license he saw at Weigand's home belonged to Weigand's ex-girlfriend and not to Cartagena. Id.

6. Cook complains that the trial judge improperly bolstered the credibility of the state firearms expert in his ruling qualifying the witness as an expert, by stating that he had dealt with the witness and his boss for 25 years and had seen their work and heard their testimony many times. Cook, however, did not object to this statement by the trial court and therefore cannot raise this issue on appeal. *Warbington v. State*, 267 Ga. 462, 463 (2) (479 SE2d 733) (1997) (a party cannot ignore an alleged injustice at trial, take his chances on a favorable verdict, and complain later); *State v. Griffin*, 240 Ga. 470 (241 SE2d 230) (1978) (a party who fails to object to a trial court's alleged improper comment at trial is estopped from raising an objection on appeal).

7. The trial court did not err by permitting the state DNA expert to testify that Cook's DNA matched the DNA taken from the crime scene, even though the test result sheets had not been admitted into evidence. The record shows that the state DNA expert performed the DNA tests himself and could therefore state his opinion regarding the test results. See *Peters v. State*, 268 Ga. 414, 415 (1) (490 SE2d 94) (1997) (an expert may base his opinion on facts within his personal knowledge). Cook's objection to the admission of the testimony of the state firearms expert, based on the non-admission into evidence of the test bullets he used for comparison with the crime scene bullets, is without merit for the same reason. Id. The trial court later

---

[5] At trial, Cook attempted to portray Weigand, one of the early suspects in the case, as the possible killer due to comments he made to an ex-girlfriend after the murders and his father's ownership of a nine millimeter pistol. The evidence at trial showed that Weigand did not chew tobacco, he never owned or had access to an AR-15 rifle, Weigand's father's pistol was a Beretta and not a Ruger, and Weigand's DNA did not match the DNA from the crime scene. Weigand's parents also testified that he was home on the night of January 2, 1995.

admitted the DNA test result sheets for the limited purpose of Cook's examination of his DNA expert, but refused to allow the highly technical test result sheets to go out with the jury. This ruling was not an abuse of discretion. *Hicks v. State*, 256 Ga. 715, 720 (3) (352 SE2d 762) (1987) (trial court may exclude evidence if it could mislead or confuse jury).

8. A defense expert in the field of population statistics testified that the crime scene DNA sample was a "mixed sample," meaning that it included more than one person's DNA.[6] The expert opined that this affected the probability determination (1:20,000) by the Crime Lab. Cook then asked the expert if he had an opinion about whether the Cellmark Laboratory (which the witness was not affiliated with) would issue a probability determination on a mixed sample. The state objected that it was irrelevant and speculative what another laboratory might do, and the trial court sustained the objection. We find no error. OCGA § 24-2-1; *Alexander v. State*, 239 Ga. 108, 110 (1) (236 SE2d 83) (1977) (admission of evidence is a matter which rests largely within the trial court's discretion).

9. At trial, Cook sought to introduce the testimony of several witnesses who had been suspects in the case concerning the alleged coercive "course of conduct" by the police during the investigation, especially in the questioning of suspects. The trial court determined that none of these suspects had actually confessed to the crimes, and noted that Cook had not been interrogated by any of the law enforcement officers who had questioned these suspects. Therefore, the trial court did not err by excluding this evidence as irrelevant. OCGA § 24-2-1; *Weems v. State*, 269 Ga. 577, 578-579 (2) (501 SE2d 806) (1998) (evidence of the conduct of police officers during an investigation not admissible when not relevant to the issues at trial); *Morris v. State*, 264 Ga. 823, 824-825 (2) (452 SE2d 100) (1995).

10. The trial court did not err by ruling that Cook could not introduce, absent a stipulation by the state, testimony about the use of police lie detector tests to exclude certain suspects. *Robertson v. State*, 268 Ga. 772, 779 (21) (493 SE2d 697) (1997); *Ward v. State*, 262 Ga. 293, 296 (5) (417 SE2d 130) (1992).

11. The trial court did not err by admitting crime scene and pre-autopsy photographs of the victims. *Bright v. State*, 265 Ga. 265, 284 (16) (455 SE2d 37) (1995); *Osborne v. State*, 263 Ga. 214, 215 (2) (430 SE2d 576) (1993).

12. Cook filed a motion in limine to suppress as prejudicial a sketch drawn by a crime scene investigator which he alleged graphi-

---

[6] The state presented evidence that Cartagena was the source of the "uninterpretable allele" since the saliva was dabbed from her skin.

cally portrayed the partially-undressed body of the female victim. However, the record reveals that it was Cook who tendered the sketch into evidence at trial. Therefore, Cook has waived his argument that the sketch would prejudice the jury. *Barnes v. State*, 269 Ga. 345, 356 (19) (496 SE2d 674) (1998) (invited error is not grounds for reversal).

13. Cook's contention that the state violated OCGA § 17-16-4 by failing to provide sufficient discovery regarding the ballistics examination is without merit. The record shows that Cook was provided before trial with the report of the state firearms expert listing his conclusions, which were based on his microscopic examination of bullets and shell casings for each weapon tested in the case. Cook is not entitled to the internal documents and work product of the Crime Lab. *Williams v. State*, 251 Ga. 749, 753 (3) (b) (312 SE2d 40) (1983); *Self v. State*, 232 Ga. App. 735, 737 (3) (503 SE2d 625) (1998); *Andrews v. State*, 196 Ga. App. 790, 791 (397 SE2d 63) (1990).

14. Cook's argument that the state failed to prove the chain-of-custody for the admission into evidence of the crime scene bullets and shell casings is without merit. *Stephens v. State*, 259 Ga. 820, 821 (3) (388 SE2d 519) (1990).

15. The trial court did not err by allowing a witness to testify for the state in the sentencing phase that Cook exposed himself to her and a friend at Lake Juliette in 1993. Evidence in aggravation may include reliable information tending to show a defendant's general bad character. *Williams v. State*, 258 Ga. 281, 287 (7) (368 SE2d 742) (1988); *Fair v. State*, 245 Ga. 868, 873 (4) (268 SE2d 316) (1980).

16. Cook's death sentence was not imposed as the result of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve the deliberate, unprovoked killing of two or more people, and thus show the willingness of juries to impose the death penalty under these circumstances.

*Judgments affirmed. All the Justices concur, except Fletcher, P. J., who dissents.*

### APPENDIX.

*Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Isaacs v. State*, 259 Ga. 717 (386 SE2d 316) (1989); *Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga.

616 (340 SE2d 891) (1986); *Blanks v. State*, 254 Ga. 420 (330 SE2d 575) (1985); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Burden v. State*, 250 Ga. 313 (297 SE2d 242) (1982); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Waters v. State*, 248 Ga. 355 (283 SE2d 238) (1981); *Gilreath v. State*, 247 Ga. 814 (279 SE2d 650) (1981).

FLETCHER, Presiding Justice, dissenting.

I disagree with the majority's conclusion that the defendant's confession to an FBI agent was voluntary because the agent was the defendant's father. None of the cases relied upon by the majority involves a law enforcement officer who is also a family member and who questions the defendant after the invocation of the right to counsel and before *Miranda*[7] warnings. Therefore, I dissent.

After the defendant was formally arrested and had asked for a lawyer, he was questioned by Agent Cook without being given *Miranda* warnings. *Minnick v. Mississippi*[8] is clear in its requirement that once "counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present."

When Agent Cook first questioned the defendant about the crimes, the defendant said he could not speak with him because "you're a cop." Only after Agent Cook assured him that he (Agent Cook) was acting as a parent did the defendant answer questions. Agent Cook proceeded to "question[ ] [the defendant] like you would question a criminal suspect" and obtained incriminating admissions. Despite assuring the defendant that he was acting as a parent and not as a cop, Agent Cook immediately called his supervisor because "I needed to tell law enforcement that I thought my son was responsible" and told his supervisor that he planned to go to Sheriff Bittick the next day. In less than 24 hours, Agent Cook did inform the sheriff of the defendant's admissions.

After the defendant's arrest, the record shows that Agent Cook sought to question him in part because he was "law enforcement oriented" and that he had the intent of revealing any incriminating statements the defendant made to law enforcement officials. No one informed the defendant of this intent or of his *Miranda* rights. Instead, the sheriff told him that "his Daddy wanted to talk to him." The "talk" consisted of the defendant "not volunteering any of [the confession, but] responding to specific and direct questions." The record shows that Agent Cook conducted the type of thorough interrogation expected of an experienced FBI agent, even though he

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (86 SC 1602, 16 LE2d 694) (1966).
[8] 498 U.S. 146, 153 (111 SC 486, 112 LE2d 489) (1990).

admitted at the *Jackson-Denno*[9] hearing that he was "not conducting an interview as objectively as I would normally." After obtaining the defendant's confession, Agent Cook informed the sheriff of all that the defendant had said and later gave a written statement.

When the sheriff initiated the contact between the defendant and Agent Cook, the sheriff had a long-standing personal and professional relationship with Agent Cook and knew that he would disclose future admissions as he had revealed the defendant's prior admissions. GBI Agent Upton, who arrested the defendant, testified that shortly after he brought the defendant to Monroe County and before Agent Cook began his questioning, he (Agent Upton) informed Sheriff Bittick and the district attorney that the defendant had requested a lawyer. The law enforcement officers all agree that no efforts had been made to contact a lawyer prior to Agent Cook interrogating the defendant. Under the totality of these circumstances, I conclude that the behavior of law enforcement officials coerced the defendant's confession.

The cases relied upon by the majority are not on point and do not support the majority's conclusion. In *United States v. Gaddy*,[10] the aunt who urged Gaddy to confess was an evidence technician employed by the county police. The aunt did not question Gaddy about the crime, but only urged him to speak with the investigating officers about any knowledge he might have. Gaddy spoke to officers and confessed only after being informed of and waiving his *Miranda* rights. The aunt did not make a statement to police or testify regarding admissions made by Gaddy. *Buttersworth v. State*[11] is also distinguishable in that Buttersworth had not been arrested and had not invoked his right to counsel as the defendant did in this case. Additionally, in *Buttersworth* the father who received the incriminating admissions was not a law enforcement officer.

Finally, none of the other cases relied upon by the majority involves family members who were also law enforcement officers. The cases are also distinguishable because the defendant was given *Miranda* warnings before making an inculpatory statement directly to or in the presence of the police.[12]

---

[9] *Jackson v. Denno*, 378 U.S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[10] 894 F.2d 1307 (11th Cir. 1990).

[11] 260 Ga. 795 (400 SE2d 908) (1991).

[12] *State v. Massey*, 342 SE2d 811 (N.C. 1986) (the defendant had already received *Miranda* warnings and made a confession to police when he made an incriminating statement to his father in the presence of an officer); *Snethen v. Nix*, 885 F.2d 456 (8th Cir. 1989) and *Arizona v. Mauro*, 481 U.S. 520 (107 SC 1931, 95 LE2d 458) (1987) (the defendant made an inculpatory statement to a family member in the presence of police after receiving *Miranda* warnings); *Lowe v. State*, 650 So.2d 969 (Fla. 1994) (the defendant had received *Miranda* warnings and volunteered his confession to police at the urging of his girlfriend).

Even if the defendant's confession were admissible, I disagree with the majority's summary conclusion that the trial court's clear violation of *Crane v. Kentucky*[13] and OCGA § 24-3-50 was harmless. In the sentencing phase of a death penalty case, the jury is instructed to remember the evidence introduced during the guilt-innocence phase.[14] I am not persuaded that the jury would have necessarily returned a death sentence had it known all the circumstances surrounding the confession, including that no law enforcement officer told the defendant that any statement he made would be used against him.

DECIDED MARCH 19, 1999 —
RECONSIDERATION DENIED APRIL 2, 1999.

*Ham, Jenkins, Wilson & Wangerin, Thomas H. Wilson, Kevin A. Wangerin,* for appellant.
*Tommy K. Floyd, District Attorney, Blair D. Mahaffey, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Patricia A. Burton, Assistant Attorney General,* for appellee.

---

[13] 476 U.S. 683, 688-690 (106 SC 2142, 90 LE2d 636) (1986).
[14] Ga. Super. Ct. Pattern Jury Instructions (Criminal) (IV) (B) (13) (b).