S08A0309, S08X0310. SCHOFIELD v. COOK; and vice versa.

(663 SE2d 221)

THOMPSON, Justice.

A jury convicted Andrew Allen Cook of the murders of Grant Patrick Hendrickson and Michele Lee Cartagena; Cook received a death sentence for Cartagena's murder and a life sentence for Hendrickson's murder. This Court affirmed Cook's convictions and sentences in 1999. *Cook v. State*, 270 Ga. 820 (514 SE2d 657) (1999). Cook filed a petition for writ of habeas corpus on May 9, 2000, which he amended on March 7, 2002. An evidentiary hearing was held on October 8 and 9, 2002. In an order filed on October 2, 2007, the habeas court vacated Cook's death sentence on the basis that he received ineffective assistance of trial counsel but left his convictions in place. The warden has appealed in case number S08A0309, and Cook has cross-appealed in case number S08X0310. In the warden's appeal, we reverse and reinstate Cook's death sentence. In Cook's cross-appeal, we affirm.

*I. Factual Background*

Grant Patrick Hendrickson and Michele Lee Cartagena were students at Mercer University. At approximately midnight in the early morning hours of January 3, 1995, the couple was parked next to Lake Juliette. Cook had never met them. Cook, who had been seen earlier parked near the entrance to the lake area, drove up to their car and fired 14 times with an AR-15 assault rifle, drew closer, and fired five times with a 9-millimeter handgun. Cook then dragged Cartagena a short distance, partially removed her clothing, spread her legs and knelt between them, and spit on her. The crimes remained unsolved for nearly two years; however, an investigator eventually identified Cook as the killer by researching owners of AR-15 rifles. The evidence at trial included Cook's admissions of guilt to his father, a friend, and his ex-girlfriend; ballistics evidence linking the bullets used in the murder to weapons Cook had owned; and DNA evidence linking Cook to the sputum on Cartagena's thigh. In his admission to his friend, Cook reportedly smirked, stated that he committed the murders "to see if [he] could do it and get away with it," and stated that he was confident his ex-girlfriend would

never report him to investigators because she knew he would murder her if she did.

## Case No. S08A0309

### II. Alleged Ineffective Assistance of Counsel

In case number S08A0309, the warden appeals from the habeas court's determination that trial counsel were ineffective for failing to adequately investigate and present evidence of Cook's mental health status and for failing to present other mitigation evidence. To prevail on his ineffective assistance of counsel claim, Cook must show that trial counsel rendered constitutionally-deficient performance and that actual prejudice of constitutional proportions resulted. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985). To show actual prejudice, Cook must show that

> there is a reasonable probability (i.e., a probability suffi- cient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Cit.]

*Smith*, 253 Ga. at 783 (1). We accept the habeas court's findings of fact unless they are clearly erroneous, but we apply the facts to the law de novo. *Strickland*, 466 U. S. at 698; *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993). For the reasons discussed below, we find that the absence of trial counsel's professional deficiencies would not in reasonable probability have resulted in a different outcome in either phase of Cook's trial, and, accordingly, we order his death sentence reinstated. See *Schofield v. Holsey*, 281 Ga. 809, 812, n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

### A. Mental Health Evidence

The warden contends the habeas court erred by vacating Cook's death sentence based, in part, on trial counsel's failure to investigate and present evidence of Cook's mental health. We begin by noting that a large portion of the habeas court's order catalogues actions properly taken by trial counsel in pursuing the possibility of a mental health defense. The record supports the habeas court's finding that trial counsel realized early in their representation of Cook that a verdict of guilt was likely and therefore, they would have to focus much of their energy on the sentencing phase. Counsel learned directly about Cook's background by interviewing Cook, his friends, and his family members. During Cook's interview, counsel asked

about any history of abuse. Counsel learned that Cook had been physically abused by his stepfather and that Cook claimed to have memory problems and to hear voices. At that time, Cook specifically denied a history of sexual abuse.

Counsel then sought and obtained a recommendation from expert death penalty litigators for a social worker who prepared a "psychosocial assessment" of Cook at counsel's request. In her detailed report, the social worker stated her findings and recommendations were based on an interview with Cook, a meeting with a nurse in Cook's jail, several meetings with trial counsel, case materials provided by trial counsel, psychological records from Cook's childhood, a summary provided by Cook's father, and interviews with Cook's father, mother, brother and one of his sisters. Although in Cook's habeas proceedings the social worker and habeas court described the report as preliminary, that characterization overlooks language used in the report indicating otherwise, as well as the detailed information about Cook and his family contained in the report. The social worker stated that Cook had been a shy and awkward child but that his family life was essentially positive until his mother divorced Cook's father in 1981, when Cook was seven years old. The social worker described difficulties encountered when Cook's father remarried in 1983 and the fact that his father thereafter chose to live with his sons apart from his new wife for some time in an attempt to mitigate those difficulties. She reported that Cook was evaluated in 1984 at the age of nine because he was "emotionally exhausted" from the disruption in his family life and because he was having difficulty in school.

She specifically described how Cook went to live with his mother, how his mother eventually remarried, how Cook's stepfather drank excessively and disliked Cook, and how Cook and his stepfather fought with one another. She reported that in 1989, which was around the time that his brother obtained a driver's license, Cook began demonstrating "antisocial behaviors," including burglarizing a neighbor's house and stealing and then fraudulently using a box of checks. These behaviors, she reported, led Cook's parents to hospitalize him at Coliseum Psychiatric Hospital for approximately five weeks, where the staff described him as "sad and angry" but not as having any delusions or thought disorders. She reported that as Cook grew older and after Cook's brother moved out, Cook's relationship with his stepfather worsened. His stepfather abused him emotionally and physically and even threatened to kill him. She reported that Cook committed another burglary after he was released from Coliseum Psychiatric Hospital and as a result, he was arrested and placed on probation for a year. She reported that Cook's mother divorced Cook's stepfather in 1994 and became "too lenient" with

Cook in an attempt to compensate for Cook's previous living situation. She reported that in December 1994 Cook's mother had to sell her home, Cook took the loss of the home hard, and the murders occurred several days later. Finally, she reported that Cook claimed to have been hearing voices and he exhibited some seemingly paranoid thinking, but he did not appear to be delusional and she speculated that the murders could possibly have been the result of a "psychotic break."

As noted in our summary of the social worker's report, trial counsel also obtained Cook's childhood psychological records. These records presented a mixed picture of Cook as a child. In 1984, at the age of nine, Cook was evaluated by a psychologist, who found that he "strongly dislike[d] school," "seem[ed] to live in a dream world," was withdrawn and unhappy, had wounded his own wrist, had threatened to hurt himself by choking himself with a string, and was having problems with family relationships. The psychologist recommended classes for learning disabled students, possible tutoring, additional attention from family members, "some therapeutic intervention" if school problems persisted, and another appointment if no improvement occurred. She reported that Cook was "emotionally exhausted" from the disruptions in his family life but she felt Cook's parents were "doing a very fine job."

Counsel also obtained and reviewed records from Cook's 1989 hospitalization at Coliseum Psychiatric Hospital, where he was admitted because of his "increasingly severe behavior problems and episodes of marked oppositional violations of major social rules." The psychologist who evaluated him at that time noted that he reported previously trying to commit suicide, but " 'not very hard.' " The psychologist also reported that Cook was isolated and lethargic, that the disruption in his family life did not alone seem to explain the "underlying rage he [was] containing," and that "his oppositional behavior [was] severe." A psychiatrist who evaluated Cook noted his increasingly serious acts of misbehavior, including his shooting of a dog, stealing guns and blank checks, and carving his name in his arm with a razor blade. The psychiatrist specifically noted that Cook denied any history of physical or sexual abuse and that his relationship with his stepfather was, at that point, "fair." Cook's diagnoses upon discharge were major depression and oppositional defiant disorder and it was recommended that he take an anti-depressant and continue his individual and family therapy sessions. Cook did not receive follow-up treatment, however.

While awaiting trial, Cook was also evaluated by a psychiatrist selected by the trial court. Although it appears counsel did not directly provide any records to the court's psychiatrist, the psychiatrist's report indicates that he had records from Cook's 1989

hospitalization. The psychiatrist noted Cook's reported memory problems and found they likely resulted from "painful events in childhood." He noted that Cook reported mistreatment from his stepfather, including an alleged attempt to kill him and a statement to Cook that he looked "like a 'psychopathological killer.' " He also noted that Cook reported previous suicidal thoughts but no actual suicide attempts. He performed personality testing on Cook, but he deemed the results invalid because it appeared that Cook was "consciously attempting to paint a somewhat overly virtuous picture of himself, while at the same time reporting a great deal of discomfort and distress." He concluded that Cook's "overall profile was highly suggestive of an attempt to appear much more disturbed than he actually [was]." He noted that Cook claimed to be hearing voices, but he concluded as follows: "Assuming he is telling the truth, these experiences do not closely resemble the hallucinations seen in acute mental illness." He also concluded that Cook's thought processes were not indicative of "acute mental illness." His overall conclusions were that Cook appeared *not* to be suffering from any "major psychiatric disorder," that he appeared to have "some emotional problems stemming from his childhood . . . and his difficulties with his stepfather," and that he appeared to be "deliberately attempting to manipulate [the psychiatrist's] conclusions about him and to appear more psychologically disturbed than is actually the case."

Once the court-ordered evaluation was complete, counsel arranged for Cook to be examined by their own expert. A review of all of the testimony in Cook's habeas proceedings reveals that, at a minimum, counsel provided their psychologist with the report by the court's psychiatrist, a letter written by a jail doctor reporting that Cook claimed to be hearing voices, reports from Cook's psychological treatment in 1984, the records from Cook's 1989 hospitalization, and the report by the social worker employed by the defense. Counsel informed their psychologist by letter that Cook claimed not to have a clear memory of the murders, that Cook claimed to remember only "flashbacks" in his dreams, and that there was some initial information suggesting Cook might not have been the killer. Accordingly, counsel informed their psychologist as follows:

> The top concern I have is whether there is a psychological or physical neurological explanation of why Mr. Cook would have expressed an admission if he did not commit the crime.

However, contrary to the habeas court's order, the record does not support a finding that counsel instructed their psychologist to limit his evaluation solely to this question. Instead, the psychologist's testimony shows that he conducted a thorough neuropsychological

examination. He, in his own words, conducted a "thorough interview" of Cook in person, and he administered over a dozen separate psychological tests. Counsel testified that he consulted with the psychologist after the examination to discuss the results, but that the psychologist told him that his diagnosis was antisocial personality disorder and that Cook was "a very angry young man."

Although counsel communicated with the psychologist only orally prior to trial, counsel asked the psychologist to memorialize his findings in a written report which was submitted to counsel after the trial. The lengthy report confirms that, at a minimum, the psychologist was well aware of the following when he conversed with counsel: most aspects of Cook's family background; the details of his psychiatric treatment at age 15 and the fact that his follow-up care was discontinued; Cook's history of suicidal thoughts; Cook's educational and employment background; and the details of the findings by the court-ordered psychiatric evaluation several months earlier, including the findings regarding Cook's claims regarding memory loss and hallucinations. Although we do not consider this written report to establish the truth of the matters asserted in it, we do consider it as an indication of the facts known to the defense psychologist at the time of his evaluation and his conversation with defense counsel. Compare *Waldrip v. Head*, 279 Ga. 826, 828 (II) (A) (620 SE2d 829) (2005) (refusing to consider inadmissible hearsay on appeal despite the absence of any objection). The essential details of what conclusions the psychologist reached are contained within his testimony in the habeas record. He testified that he administered a personality inventory, but that he had to disregard the results because he believed Cook had attempted to manipulate the outcome. He testified that he ruled out schizophrenia and mood disorders, despite Cook's prior reports of hallucinations and treatment for depression and despite his description of his history of receiving prescription medications. He also testified that Cook denied past sexual and physical abuse, despite the notations in the report by the court's psychiatrist about Cook's claim of physical abuse by his stepfather. He testified that Cook admitted to exaggerating his past illegal drug use in his evaluation by the court's psychiatrist. He also testified that he was aware of the opinion of Cook's jail doctor that Cook had been faking his alleged hallucinations.

In 1997, while Cook was incarcerated and awaiting trial, jail personnel sent Cook to River's Edge Behavioral Health Center for evaluation and treatment. The records show that during his two visits to River's Edge, Cook indicated that he was suffering from sleep problems, anxiety, depression, and audio and visual hallucinations. Although the initial diagnostic impression in the records indicates possible malingering and antisocial personality disorder,

the discharge summary, written after Cook discontinued his own treatment, omits these items and lists solely the diagnostic code for major depression with psychotic features. The records also indicate that during this evaluation Cook claimed to have been physically abused by his stepfather and to have been sexually abused by a relative. Cook was given several prescriptions based on his claimed symptoms of sleep problems and hallucinations. As determined by the habeas court, counsel did not learn of their client's referral to River's Edge until Cook's habeas proceedings and therefore, counsel did not provide records from this evaluation to their defense expert.

As trial approached, counsel consulted with their own psychologist to consider whether to present mental health evidence in the sentencing phase of trial. By this time, they had been presented reports, both oral or written, from various experts that showed Cook's history of serious misconduct, prior diagnoses of not only major depression but also of oppositional defiant disorder and antisocial personality disorder, and a history of Cook's likely malingering and attempts to mislead experts who examined him after his arrest.[1] Counsel testified that, "in the end, it was decided not to put up these mental health experts because I thought that it would end up doing more damage than good." In light of the negative evidence contained within the mental health records concerning Cook's criminal history and the experts' conclusions regarding malingering and manipulation by Cook, we conclude, as a matter of law, that counsel's strategic choice to forgo the presentation of mental health evidence was not unreasonable based on the information they actually obtained.

We also must consider, however, whether that decision was corrupted by insufficient investigation and, if so, whether actual prejudice to the outcome of Cook's case resulted. As to this ground, we find that even assuming the habeas court correctly concluded that counsel's failure to learn their client was sent to River's Edge for a psychiatric evaluation and failure to provide records from that evaluation to their psychologist constituted deficient performance, we conclude as a matter of law that Cook has not shown sufficient prejudice to warrant success of his overall ineffective assistance of counsel claim. See *Holsey*, 281 Ga. at 812, n. 1 (holding that the combined effect of trial counsel's various professional deficiencies should be considered). With the exception of Cook's new claim of sexual abuse, everything contained in the River's Edge records was

---

[1] Despite the habeas court's criticism of the timing of counsel's obtaining all of the above-described information, we find no reason to conclude that the timing actually affected counsel's ultimate strategic considerations.

already known to counsel and the defense expert. Moreover, after reviewing the documents he allegedly should have been given by trial counsel, the defense psychologist stated that such records would not have caused him to change his conclusion regarding the lack of "organicity" associated with Cook's complaints and that he would merely change his other findings to state that antisocial personality disorder was not a proper "conclusive diagnosis." We have held that the critical issue in cases such as this is what the expert reasonably selected by trial counsel "would have been willing to testify to had he been provided the materials trial counsel allegedly failed to provide." *Holsey*, 281 Ga. at 813 (II). Here, we conclude as a matter of law that, in view of what Cook's expert at trial would have testified to had counsel made him aware of Cook's 1997 River's Edge evaluation, there is no reasonable probability of a different outcome.

Furthermore, even assuming, arguendo, Cook's claim of sexual abuse would have prompted further evaluation by Cook's psychologist at the time of trial and that it would have led that psychologist to give testimony comparable to that of Cook's expert in the habeas proceedings, we find the evidence of prejudice insufficient to sustain his ineffective assistance of counsel claim. Given Cook's history of suspected malingering in mental health evaluations and his previous denials of sexual abuse, his claim of abuse made for the first time while in jail awaiting his death penalty trial likely would have appeared dubious to the jury. Although there is no direct testimony about what abuse actually occurred, we note that Cook's expert on habeas testified that the details of the alleged abuse came from Cook himself and that Cook reported one incident of abuse where a sister had him suck on her nipples when he was seven or eight years old and another incident in which he is not sure who the perpetrator was and about which no details were provided. Based on his analysis, this expert concluded that Cook suffered from recurrent major depression, dysthymic disorder, and post-traumatic stress disorder as a result of his family background and his alleged sexual abuse by his sister and his possible additional sexual abuse by some unnamed relative. Cook's new expert stated his belief that Cook saw the victims in this case kissing, which "reactivate[d] for him the abuse situation with [his sister]," which "activate[d] the rage that he had" because of his stepfather, which led him to fall into a dissociative state in which he murdered the victims, and which caused an impaired memory of the murders. Such a theory, even assuming counsel could have presented it at trial through his own expert who refused to adopt it in his habeas testimony, would not have had a strong impact on the jury in light of the totality of the evidence. Cook's claim of sexual abuse would have been undermined by the habeas testimony of his sister in which she strongly denied Cook's

claim of abuse. Thus, we find the jury likely would have found the expert's theory to be based on suspect facts and contrary to the substantial evidence showing that Cook deliberately planned the murders and that Cook remembered his crime and confessed to multiple persons, even explaining that he committed the murders simply to see if he could get away with it.

In light of the foregoing discussion, we conclude that Cook has not shown sufficient prejudice regarding this portion of his ineffective assistance claim to warrant success of his overall ineffective assistance claim. See *Holsey*, 281 Ga. at 812, n. 1 (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

### B. Evidence of Cook's Background

The warden also argues that the habeas court erred by finding counsel was deficient for failing to adequately investigate Cook's background. As outlined above, trial counsel took several important steps to investigate Cook's family background, and much of the habeas court's order catalogues the results of counsel's investigation. Counsel testified that he interviewed a number of Cook's family members and friends and traveled to Tennessee to conduct interviews. As discussed above, counsel also obtained funds to hire a social worker who provided them with detailed findings concerning Cook's background. The habeas court's order and Cook's argument in response to the warden's appeal focus primarily on the alleged impact further investigation into Cook's background would have had on the preparation of mental health evidence, an issue we have already addressed at length above. We further note that trial counsel actually did present testimony at trial concerning Cook's background in the form of lay testimony from his family. His mother described the fact that she and Cook's father divorced, that Cook first lived with his father, that his father remarried, and that Cook then came to live with her. She testified that Cook at first "got along very well" with his stepfather but that the two eventually fell into conflict. She explained that Cook was forced by his stepfather to do excessive chores, that his stepfather constantly found fault with him, and that there was physical violence between the pair "[s]everal times." She recounted how she divorced Cook's stepfather and then became unable to afford her house. Finally, she informed the jury of her feelings about Cook's background as follows: "I just feel that as a mother maybe I have — I have failed him." Cook's father, whose testimony is discussed further below, also informed the jury that he believed he had failed Cook as a father, although he admitted to the jury that he believed Cook "had a good upbringing." One of Cook's sisters testified that she visited Cook each week, and she asked the jury to spare his life because she loved him.

Counsel testified in Cook's habeas proceedings that they considered presenting the testimony of another of Cook's sisters, but they concluded that she would not make a good witness. Counsel could conceivably have introduced additional testimony of the sort highlighted in the habeas court's order showing how Cook's parents had not always provided him a stable and happy home life and how his mental health and behavioral problems could have been more aggressively addressed. However, we do not find that the lay testimony concerning Cook's background that counsel actually presented was unreasonable in light of the circumstances, particularly because so much of the additional lay testimony Cook now proposes could have alienated the jury and led to unfavorable cross-examination and the presentation of unfavorable witnesses by the State. Accordingly, we hold both that trial counsel did not perform deficiently in preparing and presenting evidence of Cook's background and that counsel's failure to present additional evidence of the kind Cook now proposes did not create prejudice sufficient to warrant the success of his overall ineffective assistance of counsel claim. See id. (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

### C. Preparation of Testimony by Cook's Father

The warden next challenges the habeas court's conclusion that trial counsel failed to adequately prepare Cook's father for his testimony. Counsel testified in Cook's habeas proceedings that in preparing for trial he considered Cook's father to be the most important witness for the sentencing phase. Counsel and Cook's father both testified in Cook's habeas proceedings that they had frequent contact with each other and that Cook's father provided the defense assistance in preparing for trial, but they also testified that their relationship had to be somewhat circumscribed given the fact that Cook's father was going to be the State's most important witness in the guilt/innocence phase. Counsel testified that he expressed to Cook's father his belief that life without parole was not going to be a viable option in Cook's case but that he did not attempt to dictate testimony to him in advance.

In the sentencing phase, Cook's father gave moving testimony. He began as follows: "Yesterday, of course, I sat up here as a cop. And now I'd like to tell you a little bit about Andy as the father." He explained to the jury how his son was already dead in some ways and how Cook, along with his family, now must live in shame. He explained that he felt he had failed "to protect his own son from the evil." He urged the jury to consider that justice without "compassion or mercy" was mere vengeance, which he said should belong to God alone. He testified that he was uncertain whether death or life without parole was the more severe punishment, and he urged the

jury to consider if Cook might now have or might ever have "something of value in him" that might warrant the possibility of parole.

Cook argues that the reference to life without parole possibly being worse than death prejudiced his defense. Many jurors, however, may have been moved by the forthrightness of Cook's father. Moreover, regardless of the opinion of Cook's father about life without parole, this testimony may have prompted many jurors to consider whether any residual value in Cook could justify his continued existence, even if he were incarcerated without the possibility of parole.

Cook's father further recounted how his son called him after his guilt/innocence phase testimony to tell him that he was proud of him, that he had done the right thing, and that he loved him. Cook's father asked the jury to close their eyes, to remember the victims' families, to think of him and the rest of Cook's family, and to picture themselves on their knees before God. He concluded by telling the jury that Cook had tried to enter a guilty plea "to save everyone from having to open these sores and feel this pain."[2] Testimony in the habeas court proceedings indicates that most persons in the courtroom, including counsel and jurors, were in tears during this testimony.

In light of the testimony actually presented at trial, we hold both that trial counsel did not perform deficiently and that counsel's failure to prepare Cook's father in a different manner did not create prejudice sufficient to warrant the success of his overall ineffective assistance of counsel claim. See id. (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

### D. Evidence that Cook Previously Exposed Himself

During the sentencing phase of Cook's trial, the State presented testimony from a woman who claimed Cook exposed himself to her and her friend at Lake Juliette in 1993. The habeas court concluded trial counsel's performance was deficient based on their failure to subpoena the friend as a witness because, the habeas court found, she would have testified that she was unable to identify Cook. Because the witness who did testify at trial stated during her testimony that the other witness could not reliably identify Cook and the potential second witness' subsequent affidavit offered no addi-

---

[2] In noting this testimony that was favorable to the defense in this case, we make no comment on the admissibility of such testimony if objected to. See *Mobley v. State*, 265 Ga. 292, 299-300 (18) (b) (455 SE2d 61) (1995) (disapproving *Mobley v. State*, 262 Ga. 808, 811 (4) (426 SE2d 150) (1993), and holding that "offers by defendants to plead guilty and testimony of prosecutors regarding their reasons for rejecting such offers are no longer admissible").

tional evidence which reasonably would have benefitted Cook's defense, we conclude Cook has not shown deficient performance. Although the habeas court made findings based on third-party reports as to what additional testimony the friend might have provided, such reports constitute inadmissible hearsay which will not be considered on appeal. See *Waldrip*, 279 Ga. at 828 (II) (A) (refusing to consider inadmissible hearsay on appeal despite the absence of any objection); *Dickens v. State*, 280 Ga. 320, 322 (2) (627 SE2d 587) (2006) (holding that inadmissible hearsay cannot be used to prove prejudice). Given the unremarkable nature of the new witness' testimony and the testimony actually presented at trial, we also conclude that Cook has not shown sufficient prejudice regarding this individual claim to warrant the success of his overall claim of ineffective assistance of counsel. See *Holsey*, 281 Ga. at 812, n. 1 (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

### Case No. S08X0310

#### E. Guilty But Mentally Ill Verdict

In his cross-appeal, case number S08X0310, Cook argues that the habeas court erred by failing to address in the ineffective assistance claim whether potential mental health evidence could have supported a verdict of guilty but mentally ill. See OCGA § 17-10-131. We have held that "the statute that provides for a verdict of guilty but mentally ill does not preclude a death sentence as the result of such a verdict." *Lewis v. State*, 279 Ga. 756, 764 (12) (620 SE2d 778) (2005). Accordingly, the habeas court did not err in failing to address the merits of Cook's claim beyond addressing the role that potential mental health evidence might have played as mitigating evidence in the sentencing phase, which we addressed above.

#### F. Crime Scene Expert

Cook also argues that the habeas court erred by failing to address whether trial counsel were ineffective for failing to employ a crime scene expert. We find, however, that the testimony Cook presented in his habeas proceedings would have had no net positive effect on the jury's deliberations, as that testimony concerned matters of common sense and matters that could easily have proven to be more harmful than beneficial to his defense. Accordingly, we conclude that as to this claim, Cook has failed to show either deficient performance or prejudice to his defense.

#### G. Admissibility of Cook's Confession to His Father

Cook's father was an FBI agent at the time of Cook's arrest. After his arrest, Cook asked to see an attorney and his father, and

Cook was given no *Miranda* warnings. See *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). Cook's father also asked that he and Cook be allowed to speak to each other, and they were allowed to do so. On direct appeal, this Court held that Cook's confession to his father without *Miranda* warnings was properly admitted into evidence. We held that such cases

> must be resolved on a case-by-case basis, by viewing the totality of the circumstances, in order to determine if the law enforcement parent was acting as a parent or as an agent of the state when speaking with his or her arrested child.

*Cook*, 270 Ga. at 827 (2). In applying that standard, we noted that Cook's father had not been part of the investigative team, that the FBI did not have jurisdiction over the case, that Cook had asked to speak to his father, that Cook's father had asked to speak to Cook after his arrest without the prompting of anyone involved in Cook's case, that the father's motive was to help Cook get a favorable plea bargain, and that the conversation was accompanied by crying and hugging. Id. at 827-828 (2). Accordingly, we held that Cook's father was acting in the role of father rather than officer. Id. at 828 (2). We further noted that the conversation "was devoid of any trickery, deceit, or other psychological ploy" and that Cook would not have felt coerced to incriminate himself, and we held, accordingly, that the conversation was not accompanied by "government coercion." Id.

Cook argued in the habeas court that his trial counsel was deficient in conducting the motion to suppress his statements to his father. In support of that argument, Cook introduced a letter from his father to counsel; however, the contents of the letter are inadmissible hearsay and cannot be considered for the truth of the matters asserted therein. See *Waldrip*, 279 Ga. at 828 (II) (A) (refusing to consider inadmissible hearsay on appeal despite the absence of any objection). Cook also introduced testimony from his father indicating, like the letter, that a file on the Lake Juliette murders had been opened by the FBI, that the FBI had assisted local officials on the case, and that he had "actively participated in a supervisory capacity" on several occasions as the "relief supervisor." He added, however, that "as an investigative agent, [he] never actually physically worked on this case." Because his habeas testimony does not reveal that he had an actual investigative role, it is consistent with his testimony in the trial court that, although he knew his office had done some work to assist in the case, he had not personally worked on the case and knew details about the case only

from what he had read in the paper. Although his habeas testimony, if presented at trial, would have led this Court to modify its statement that "the FBI did not have jurisdiction to investigate the case," it would not have changed the outcome of our analysis regarding whether Cook's father was acting as an FBI agent or as a father at the time of his conversation with Cook. *Cook*, 270 Ga. at 827 (2). Accordingly, even assuming trial counsel performed deficiently regarding this issue, no prejudice to Cook's defense resulted. This individual claim in Cook's cross-appeal cannot help support Cook's overall ineffective assistance claim. See *Holsey*, 281 Ga. at 812, n. 1 (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

*H. Cross-Examination of Michael Hancock*

Cook argues in his cross-appeal that the habeas court erred by not finding that trial counsel rendered ineffective assistance during the cross-examination of Michael Hancock, the friend to whom Cook confessed. On direct examination at trial, Hancock described Cook's confession to him in detail. However, on cross-examination, counsel questioned him about his having initially given a more limited version of Cook's confession to a ranger working for the Department of Natural Resources. Hancock explained in his trial testimony that the ranger had told him "to be quiet" for the moment and asked him if he instead would make a statement to the GBI. The cross-examination Cook now claims trial counsel should have conducted is equivalent to the cross-examination that counsel actually did conduct. Accordingly, we conclude that this claim shows neither deficient performance by counsel nor any prejudice to Cook's defense.

*I. Combined Effect of Individual Ineffective Assistance Claims*

We have set out above the instances in which we have found or assumed trial counsel's deficient performance. We conclude, considering the combined effect of those deficiencies, that they did not in reasonable probability affect the outcome of either phase of Cook's trial. Id. Accordingly, we order Cook's death sentence reinstated.

*Judgment affirmed in Case No. S08X0310. Judgment reversed in Case No. S08A0309. All the Justices concur.*

DECIDED JUNE 30, 2008 —
RECONSIDERATION DENIED JULY 25, 2008.

*Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Patricia B. Attaway Burton, Susan V. Boleyn, Senior Assistant Attorneys General,* for appellant.

*Thomas H. Dunn,* for appellee.